**In the Interest of S.K. and S.K., Children.**

No. 05–05–01039–CV.

Court of Appeals of Texas, Dallas.

Aug. 15, 2006.

Maridell J. Templeton, Charles W. Vaughn, Dallas County Public Defender Office, Dallas, for appellants.

Sylvia Cantu, Lori L. Ordiway, Assistant District Attorney for Dallas County, Chief of the Appellate Division, Dallas, for appellee.

Before Justices WRIGHT, MOSELEY, and LANG.

## OPINION

Opinion by Justice MOSELEY.

Following a bench trial, the trial court entered a decree terminating the parental rights of the biological parents, Berena Tijerina and Eric Jovon King, to their children Sh. K. and Sa. K. Both parents present issues challenging the legal and factual sufficiency of the evidence support-

ing the grounds for termination found by the court. For the reasons that follow, we overrule the parents' points of error and affirm the trial court's decree of termination.

## I. PROCEDURAL BACKGROUND

Mother was twenty-seven years old and Father was twenty-eight years old at the time of trial; they had never married. They are the parents of five children: E.K., D.K., Sh. K., Sa. K, and M.K. In March 2001, Mother and Father voluntarily relinquished their rights to E.K. and D.K.; at the same time, Mother also relinquished her rights to her oldest child, A., who is not Father's child.

This suit concerns Sh., born July 18, 2002, and Sa., born June 20, 2003. On February 12, 2004, daycare workers saw a red mark on Sa.'s cheek and, dissatisfied with Mother's explanation, called the Dallas County Child Protective Services Unit of the Texas Department of Family and Protective Services (CPS). CPS removed the children that day. Pursuant to CPS's SAPCR petition for emergency care and temporary managing conservatorship, CPS was appointed temporary managing conservator of the children. Sh. and Sa. were placed in the foster care of the adoptive mother of E.K. and D.K. and received early childhood intervention services from the Dallas Metro Care Services. Service plans were drawn up for Mother and Father, who were evaluated by a psychologist. Beginning in March 2004 and continuing through the time of trial (about fifteen months), Mother and Father had weekly counseling sessions. They also attended parenting classes. During that time, Mother and Father had supervised weekly visits with Sh. and Sa. at the CPS office.

Subsequently, CPS filed a petition to terminate Mother's and Father's parental rights to Sh., Sa., and M.K. (born April 8, 2005), alleging as grounds that they knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, or they engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being, and termination was in the best interest of the children. The children's maternal grandparents intervened. The suit regarding M.K. was severed from this cause. In its decree, the trial court found the allegations in the petition true, terminated Mother's and Father's rights, and appointed CPS permanent managing conservator of Sh. and Sa. Mother and Father filed motions for new trial, which were overruled by operation of law, and appealed. *See* TEX. FAM.CODE ANN. § 263.405(a) (Vernon Supp.2006); TEX.R.APP. P. 26.1(b).

## II. SUFFICIENCY OF THE EVIDENCE

### A. Endangerment

In Mother's issues one through four and Father's eight issues, they challenge the legal and factual sufficiency of the evidence supporting the trial court's findings as to the endangerment grounds.

### 1. Applicable Law

Before parental rights can be involuntarily terminated, the trial court must find by clear and convincing evidence that: (1) the parent has committed one of the enumerated statutory conditions, and (2) termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001 (Vernon Supp.2006). Here, the trial court terminated Mother's and Father's parental rights under sections 161.001(1)(D) and (E) of the family code. The trial court was required to find only one of the statutory

conditions to be true, as well as find that the termination was in the children's best interest in order to terminate Mother's and Father's parental rights. *Id.; Wilson v. State*, 116 S.W.3d 923, 928 (Tex.App.-Dallas 2003, no pet.).

Section 161.001(1)(D) requires clear and convincing proof that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangers the physical or emotional well-being of the child." TEX. FAM.CODE ANN. § 161.001(1)(D). This section refers only to the acceptability of a child's living conditions. *In re S.H.A.*, 728 S.W.2d 73, 84 (Tex.App.-Dallas 1987, writ ref'd n.r.e.).

Section 161.001(1)(E) requires clear and convincing proof that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM.CODE ANN. § 161.001(1)(E). This section refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act. *In re S.H.A.*, 728 S.W.2d at 85. The conduct to be examined includes what the parent did both before and after the child was born. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex.App.-Dallas 1995, no writ).

*Endanger* means to "expose to loss or injury; to jeopardize." *In re M.C.*, 917 S.W.2d 268, 269 (Tex.1996). Although *endanger* means more than a threat of physical injury or the possible ill effects of a less than ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers an injury. *Id.*

**2. Standard of Review**

■ In reviewing the legal sufficiency of the evidence to support a termination finding, we look at all of the evidence in the light most favorable to the termination finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction about the truth of the matter on which the Department bears the burden of proof. *In re J.L.*, 163 S.W.3d 79, 84–85 (Tex.2005); *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex.2002); *Wilson*, 116 S.W.3d at 928. We assume that the factfinder resolved any disputed facts in favor of its finding, if a reasonable factfinder could so do, and disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *J.F.C.*, 96 S.W.3d at 266. We do not, however, disregard undisputed evidence that does not support the finding. *Id.*

■ In reviewing the factual sufficiency of the evidence, we must give "due consideration" to any evidence the factfinder could reasonably have found to be clear and convincing. *Id.* (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex.2002)). We must consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. *Id.* If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient *Id.*

**3. Evidence**

The incident that gave rise to CPS's involvement with Sh. and Sa. began with the arrival of the children at their daycare center on February 12, 2004. Sh. was then a nineteen-month-old girl, and Sa. was an eight-month-old boy. They had been attending this daycare since October 2003. The daycare director testified that Sa. had a bruise that "was a red mask [taking] up approximately half of his face." Mother told the director that Sh. had "knocked [Sa.] out of his car seat which caused him to hit the floor." The director did not think the explanation was "plausi-

ble" because the distance from a car seat to the car floor was not far enough to cause that type of bruise. The director thought the bruise required medical attention, and she called CPS to "take him to the doctor." Later, the psychologist testified Mother told her that the buckle in the daycare van hit Sa. Casey Arnold, a CPS investigator, testified that Mother told her that Sh. had hit Sa. because she wanted his bottle.

On the day they were removed, Sh. and Sa. had lice and were wearing the same clothes and diapers as the day before. The daycare director testified that, on three previous occasions, the children had "full blown lice." Although she discussed the lice with Mother, daycare personnel treated the lice themselves. In addition, the daycare director testified that the children were "frequently dirty" and had a "stench that was offensive to the staff"; the daycare bought baby wash and other cleaning products just for the two children and used them "routinely." The daycare also frequently used its clothes when the children wore dirty clothes from the previous day. Another daycare employee testified the children sometimes arrived at the daycare wearing diapers from the previous day. Because Mother did not bring enough diapers for both children, the daycare used its diapers and other children's diapers; the daycare asked Mother to bring more diapers, but Mother did not do so, telling the director she did not have enough money to buy diapers. The daycare director also testified that Mother listened to her suggestions about the children, but Mother "was not effective" in doing "what she needed to do just for sanitary purposes for her children."

The daycare director testified she believed Sa. was developmentally delayed, but when she talked to Mother about her concerns, Mother told her "the doctor said he was fine." The daycare director described conversations with Mother—Mother told her a woman had cursed her at the bus stop and she was "scared for her life," and Mother told her she had scabies and she "needed to check every child in the center"—and testified that she believed Mother was "unstable" and "paranoid" because she thought "somebody was out to get her." In addition, a man, not Father, accompanied Mother to the daycare on three or four occasions to pick up the children, and Mother identified him as the children's father. The daycare director testified she never saw Father at the daycare center.

Hollie Martinez, the CPS caseworker assigned to this case, testified that the children's paternal aunt told her that Sh. and Sa. had lice, were dirty, and "looked as if no one cared for them." In addition, the maternal grandmother testified that the children had lice and Mother was "lazy" and "negligent"; left the children in dirty diapers and clothes; and did not clean them properly.

The daycare employees testified Sh. was speech delayed and would not play with other children. Jacelyn Revland, an early childhood intervention (ECI) specialist with Dallas Metro Care Services, testified that Sh. was developmentally delayed. Although an eighteenth-month old child should have a vocabulary of at least seventy-five-words, Sh. had a few words, was not speaking in two word phrases, and Revland could not understand what she was saying. By the time of trial, after about eighteen months of ECI services, Revland testified Sh. was speaking in three and four word sentences and could be understood "age appropriately." Revland testified Sh. was still developmentally delayed. According to Revland, the intervention worker was the consultant to the parent, who is to stimulate the child be-

tween the forty-five-minutes-per-week intervention visits and work on the ECI service plan in the daily care routine.

The foster mother, who had adopted E.K. and D.K., testified that E.K. was learning delayed and D.K. had a very severe speech delay when they entered her home. The foster mother had worked with both children, and they had improved. According to the foster mother, when Sh. first came to her house, she would yell when she wanted something or something was taken from her, but she seemed to improve after the foster mother talked to her. Also, Sh. would hit others when she did not get her way, but those instances were "not frequent" and were "maybe occasional" by the time of trial.

Regarding Sa., Nancy Hitsfelder, M.D., an early developmental disability specialist, testified that her tests of Sa. at twenty-one months strongly suggested he was mentally retarded; his delays indicated a "genetic syndrome." In addition, Sa. was tested for vision, hearing, and neurological problems. Hitsfelder testified his fine motor and visual motor functions were at a ten-month level, or half of his chronological age. He also scored about half his age in language. Although Sa. had improved, he remained delayed in all areas. According to Hitsfelder, although Sa. would improve in the future, it was likely that he would "always be delayed for his chronological age," although she did not know by how much. A parent would have to adjust interaction with Sa. accordingly.

Sa.'s foster mother testified that, when he was placed with her, he had developmental delays: he was not standing, sitting, crawling, pulling himself up, or jabbering, as she expected a nine-month old to do. He could "apparently" say two words: momma and bye-bye. About three or four months before trial, Sa. started walking and pulling himself up. According

to the foster mother, if Sa. walks to an object, he bumps into it or stands, rather than walking around it, and must be guided around it, while the foster mother explains to him what she is "trying to get him to do." There was evidence Sa. required occupational therapy, which addressed muscle tone, motor movement, and manipulation of objects; for example, Sa. had difficulty with moving his mouth to chew.

V.J. Lair, Psy.D., a clinical forensic psychologist, provisionally diagnosed Mother with Asperger's Disorder, a "pervasive developmental disorder" characterized by significant impairment of an individual's social skills and social interaction abilities and by rigidity and "over focus" on certain behaviors. Lair recommended a more focused assessment and long-term individual counseling at the Texas Rehabilitation Commission. However, there was evidence that Mother refused services from the TRC.

According to Lair, a person with Asperger's Disorder has difficulty responding to instruction or direction and "deal[ing] with a child who has substantial psychological or emotion or physiological problems." Lair also recommended "an extended period of monitoring" if the children were returned to Mother because she "gets easily overwhelmed by ordinary tasks" and "to make sure that she had made significant progress and individual treatment so that if she were to be left in charge of the children again to make sure that changes had been made."

Lair also conducted a psychological and drug and alcohol evaluation of Father and consulted with him. Lair testified Father told her he used marijuana, but was inconsistent when he began and stopped, telling her he stopped one, three, and five years ago. Father told Lair he had driven a car with the children after smoking marijuana,

although Father subsequently denied this incident and said that the testimony was a "total fabrication" of his statements. Lair also testified Father told her he had stopped drinking alcohol four, five, or seven months before the evaluation. Lair testified Father told her he typically drank a twelve-pack of beer every Friday and Saturday night, but was "just mellowed" and not intoxicated. Further, Lair testified that Father told her he smokes marijuana and drinks alcohol "to manage his anger" and "often raises his voice, uses swear words, has put his fist through a wall[,] and often has gotten into physical altercations when angry." He "tries to play video games when frustrated or angry but this is not always effective." Lair diagnosed Father with alcohol dependence and marijuana abuse. Lair recommended outpatient drug and alcohol treatment and anger management classes, but Father disagreed, saying two recent drug tests were negative and he did not need these services. Lair also testified that the absence of any support and his drug and alcohol abuse could impact his parenting because he would question his participation in the ECI programs. Lair also determined from testing that Father "reversed the parent child relationship," that is, "he tends to see the child as meeting his needs rather than the role of the parent to meet the child's needs."

Mother and Father were counseled individually and together by Lorna Brewer Loeckle, Ph.D., a licensed counselor. Mother and Father did not tell Loeckle anything about the children's needs; they told her the children were "fine." Mother denied she was pregnant with M.K. until two weeks before the baby was born. In Loeckle's opinion, Mother needed supportive employment from Texas Work Force, where Mother could be placed on a job and receive intervention by a caseworker between her and her employer. Mother gave Loeckle inconsistent information about employment, for example, hours worked and income.

According to Loeckle, Father had difficulty making decisions about the children; he did not understand why they were removed from Mother's care. Father falsely told Loeckle he had a GED. Like Mother, Father gave Loeckle inconsistent employment information and could not account for his income.

Martinez, the CPS caseworker, testified that service plans were prepared for Mother and Father that included parenting classes, family counseling, drug assessment and random drug testing, weekly parent/child visitation, a psychological evaluation. Mother completed all four service plans. The evidence that Mother's employment was "sporadic" and "unstable." She obtained some employment and provided pay stubs on one occasion. She did not develop a "positive support system"; there was evidence she had a troubled history with her own mother. Martinez testified that, even after the services, Mother's "interactions with her children were limited." Mother and Father played with the children, but their interaction and discipline were limited and often mis-directed. When they would cry, Mother and Father "would give them food instead of nurturing them." According to Martinez, Mother "did not appear to understand the issues involved in her CPS history." Martinez also testified that Mother did not agree with the diagnosis of Asperger's Disorder and did not believe the children had problems.

Martinez confirmed that Father did not complete the anger management and "supportive outpatient drug treatment" provided for in his service plan and ordered by the court. Father completed the employment requirement, to obtain and

maintain employment for at least six months, but he did not provide pay stubs for employment verification. In addition, Father did not have stable housing. Before Sh. and Sa. were removed from Mother's care, the children were with Father on weekends. He was living with his mother then, and there was evidence that his mother and sister cared for the children. Since Sh. and Sa.'s removal, Father has lived with Mother in her Section 8 apartment, although they have lied about Father's residence to Martinez and the housing authorities. Martinez testified that Father believed no change was called for, that Mother should take care of the children and he would visit. Martinez testified that Father did "not appear to comprehend his role in CPS involvements"; he was "hesitant to follow recommendations by service providers," although he had been "cooperative with caseworker." Father testified he did not agree with Hitsfelder's diagnosis of Sa. and wanted "a second opinion."

There was extensive testimony regarding Mother's and Father's voluntary termination of parental rights to the older children in March 2002. They were removed after referrals for neglectful supervision when CPS found them in the street three times and after one of the children was burned while at their maternal grandmother's house. There was testimony that the parents, and other family members, had no "insight" into "what went wrong" in the care of the older children.

There was undisputed evidence that Mother and Father loved the children and showed them affection; Mother's home was clean; she took the children for routine medical care; and the children showed no signs of physical injury, other than Sa.'s bruise and the results of the lack of cleanliness.

### 4. Discussion

■ Mother and Father argue that the evidence shows that nothing they did or failed to do caused the children's development delays, which are genetic and thus not caused by the environment Mother provided or her conduct. However, the evidence detailed above shows that Mother and Father failed to acknowledge and lacked "insight" into the children's developmental delays and failed to take action regarding the delays. There was evidence that both Mother and Father completed most of their service plans and the parenting classes and made most of the visits with the children. Thus, there was evidence that even after the counseling and parenting classes, Mother and Father exhibited limited parenting skills, did not understand the issues involved in the children's developmental needs, and CPS personnel had seen no changes in Mother's and Father's pattern of behavior through the course of CPS involvement.

Moreover, the evidence was undisputed that the children were dirty regularly and often had lice, and that Father saw the children regularly, but took no action and left them in this condition in Mother's care. Father failed to complete court-ordered anger management classes and drug treatment. Several witnesses testified to Mother's dishonesty. *See In re S.L.*, 188 S.W.3d 388, 394 (Tex.App.-Dallas 2006, no pet.) (credibility issues are resolved by factfinder). Although a close case, we conclude Mother's and Father's conduct jeopardized the children's health and development, thus endangering their physical or emotional well-being. *See In re M.C.*, 917 S.W.2d at 269.

After reviewing all the evidence under both the legal and factual sufficiency standards, we conclude the trial court could have reasonably formed a firm belief or conviction that Mother engaged in conduct

and Father knowingly placed the children with a person who engaged in conduct which endangered the physical or emotional well-being of Sh. and Sa. *See* TEX. FAM. CODE ANN. § 161.001(1)(D). We resolve Mother's third and fourth issues and Father's third, fourth, seventh, and eighth issues against them. We need not address Mother's first and second issues and the remainder of Father's issues, which address section 161.001(1)(E). *See* TEX. FAM. CODE ANN. § 161.001; *Wilson,* 116 S.W.3d at 928.

### B. Best Interest

In issues five and six, Mother argues there was insufficient evidence based on a clear and convincing standard to support the finding that termination was in the children's best interest.

### 1. Applicable Law and Standard of Review

 In determining the child's best interest, the factfinder may consider the following factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and, (9) any excuse for the acts or omissions of the parent. *Holley v. Adams,* 544 S.W.2d 367, 372 (Tex.1976). Though helpful in assessing the situation, one need not prove that each *Holley* factor favors termination, however. *In re P.E.W.,* 105 S.W.3d 771, 780 (Tex.App.-Amarillo 2003, no pet.). Much of the evi-

dence establishing a statutory ground for termination may also show that the best interests of the child warrant termination. *Id.* As stated by the supreme court: "[T]he same evidence may be probative of both issues." *In re C.H.,* 89 S.W.3d at 28. The clear and convincing standards of review applicable to the endangerment grounds apply also to the best interest ground. *In re P.E.W.,* 105 S.W.3d at 779–80.

### 2. Discussion

 We consider the evidence regarding the *Holley* factors. The children were too young to express their desires. There was evidence of both Sh.'s and Sa.'s emotional and physical needs now and in the future, specifically, that they would continue to be developmentally delayed and would need intervention. There was evidence that Sa.'s needs would be lifelong. There was no evidence of emotional and physical danger to these children now and in the future.

Regarding the parental abilities of the individuals seeking custody, there was evidence that Mother reported she was "overwhelmed" with the care of the children and either did not understand or did not acknowledge their developmental delays. For example, Mother told Lair that Sh. started walking when she was four months old, which Lair described as "not feasible," and that Sa. ate "everything adults do," which Lair reported as "not likely" for a one-year-old. Lair reported the results of a parenting inventory suggesting that Mother "understands what is expected of good parenting but is unable to apply the information with her own children adequately." Thus, even with programs available to assist Mother to promote the best interest of the children, such as ECI and parenting classes, there was evidence of Mother's inability to apply the information

she learned. There was testimony that Mother was overfeeding the children, but when told that the amount of food was too much, she completely stopped the feeding; Lair testified that this "all or none, black or white" conduct was characteristic of someone with Asperger's Disorder. Further, there was evidence from Lair that Mother was interviewed for extensive personal services, such as vocational training, but then refused further evaluation saying "she had lied about everything during the interview to just get assistance."

The foster mother testified she implemented the ECI programs, which were different for each child and were "repetitious and time consuming." The plans had to be followed "on a consistent basis." She also testified that her cousin and her husband were "willing to do anything that's necessary."

Regarding the stability of the home or proposed placement, there was evidence that Mother and Father's relationship had been "on and off" since they were in high school. After the children were removed, Father lived with Mother in Section 8 housing, although he was not supposed to be living with her; Mother initially lied to Lair about the housing arrangement, and later admitted Mother and Father were living together because otherwise Father would be "homeless." In contrast, CPS planned to place Sh. and Sa. with the cousin of the children's foster mother, who was a CPS caseworker, and her husband. Sh. and Sa. would see their siblings at family reunions.

Regarding the acts or omissions of the parent indicating the existing parent-child relationship is not a proper one, there was evidence that, although Mother had undergone the counseling and parenting classes described above, she had difficulty keeping the children clean, disciplining them, and responding to their developmental needs.

She was also dishonest about her employment and living circumstances.

Regarding any excuse for Mother's acts or omissions, Lair testified that Asperger's Disorder has a "significant impact" on parenting young children with delays because the disorder involves difficulty understanding and interpreting nonverbal language. Thus, a person with Asperger's may find it "challenging" to meet the needs of a young child who cannot identify its needs and relies on the parent to identify those needs.

After reviewing all the evidence under both the legal and factual sufficiency standards, we conclude the trial court could have reasonably formed a firm belief or conviction that termination of the parent-child relationship between Mother and Sh. and Sa. was in the children's best interest. We resolve Mother's fifth and sixth issues against her.

### III. CONCLUSION

Having resolved Mother's and Father's issues against them, we affirm the trial court's decree of termination.