

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00018-CV

_____


IN THE INTEREST OF J.W.S., F.S., CHILDREN


On Appeal from the 402nd Judicial District Court
Wood County, Texas
Trial Court No. 2012-559


Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

MEMORANDUM OPINION

Jared Wayne Scoggins' parental rights to his child, F.S., were terminated as a result of a suit brought by the Department of Family and Protective Services.  On appeal, Scoggins argues the evidence was legally and factually insufficient to support the trial court's findings that he (1) "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child" and (2) "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child."  *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E) (West 2014).[1]  We find that the evidence is legally and factually sufficient to support the trial court's termination of Scoggins' parental rights to F.S. and affirm the trial court's judgment.

I.      **Standard of Review**

A parent's rights to "'the companionship, care, custody, and management of his or her children'" are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  Decisions from Texas courts show great respect for the biological bond between parent and child, recognizing "that 'the natural right which exists between parents and their children is one of constitutional dimensions.'"  *In re J.W.T.*, 872 S.W.2d 189, 194–95 (Tex. 1994) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)); *In re J.J. & K.J.*, 911 S.W.2d 437, 439 (Tex. App.—Texarkana 1995, writ denied).  In a

---

[1]Scoggins does not challenge the trial court's finding that termination of his parental rights to F.S. was in the child's best interests.

termination case, the Department seeks to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. *See* TEX. FAM. CODE ANN. § 161.206(b) (West 2014); *Holick v. State*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings in favor of the parent. *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (citing *Holick*, 685 S.W.2d at 20).

However, the Texas Supreme Court has also recognized that "'the rights of natural parents are not absolute; protection of the child is paramount. The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities.'" *In re A.V. & J.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *J.W.T.*, 872 S.W.2d at 195). The child's emotional and physical interests must not be sacrificed merely to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

To terminate an individual's parental rights to his child, the Department must prove, by clear and convincing evidence, both of the following statutory requirements: (1) that the parent engaged in at least one of the statutory grounds for termination and (2) that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001 (West 2014); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012); *C.H.*, 89 S.W.3d at 23. The clear and convincing burden of proof has been defined as "'that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *C.H.*, 89 S.W.3d at 23 (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979) (per curiam); *see* TEX. FAMILY CODE ANN. § 101.007 (West 2014). Due process demands this heightened

3

standard. *E.N.C.*, 384 S.W.3d at 802 (citing *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). Thus, in reviewing termination findings, we determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the State's allegations. *C.H.*, 89 S.W.3d at 25.

In a legal sufficiency review, termination findings are given appropriate deference. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 679 (Tex. App.—Austin 2005, no pet.). In such cases, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder could reasonably have formed a firm belief or conviction that the grounds for termination were proven. *E.N.C.*, 384 S.W.3d at 802 (citing *J.F.C.*, 96 S.W.3d at 266); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.). We assume that the fact-finder resolved disputed facts in favor of the finding if a reasonable fact-finder could do so, disregard evidence that the fact-finder may have reasonably disbelieved, and disregard testimony from witnesses whose credibility may reasonably be doubted. *E.N.C.*, 384 S.W.3d at 802 (citing *J.F.C.*, 96 S.W.3d at 266); *J.P.B.*, 180 S.W.3d at 573. We consider, however, undisputed evidence, even if it is contrary to the finding. *J.P.B.*, 180 S.W.3d at 573. That is, we must consider evidence favorable to termination if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* We must, therefore, consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is solely the fact-finder's province. *Id.* at 573, 574.

If, in weighing the disputed evidence, the fact-finder could have reasonably resolved the conflicts to form a firm conviction that the State's allegations concerning the grounds for termination were true, then the evidence is factually sufficient and the termination findings must be upheld. *C.H.*, 89 S.W.3d at 18–19; *see J.F.C.*, 96 S.W.3d at 266. In applying this standard in light of the clear and convincing standard, we must be careful not to "'be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt.'" *In re R.A.L.*, 291 S.W.3d 438, 443 (Tex. App.—Texarkana 2009, no pet.) (quoting *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam)).

## II. Factual Background

The Department initially became involved after it received a report that Candice Smith and her newborn baby, F.S., both tested positive for illegal drugs at the time of delivery on August 24, 2012. Smith admitted to Magan Cleveland, the Department's investigations supervisor, that she had used marihuana and methamphetamines throughout her pregnancy. Smith informed Cleveland that the child's father, thirty-three year-old Scoggins, was incarcerated at the time of the child's birth. Through discussions with Smith, Cleveland learned that Scoggins and Smith had been dating for seven years even though Scoggins was still married to Megan Scoggins. As a result of their affair, Smith and Scoggins were also the parents of four-year-old J.S., who resided with a paternal great uncle, and five-year-old J.W.S., who had been voluntarily left with "fictive kin" Leetha and Gene Riley. With another woman, Scoggins had also fathered a child, K.S., a child whose sole managing conservators were Scoggins' father and stepmother. Cleveland's investigation revealed that neither Smith nor Scoggins had ever acted

5

as the primary caregivers of any of the children. The Department took possession of F.S. and J.W.S.[2]

Smith, who had an extensive history of drug use, was on community supervision for drug-related offenses both during the Department's initial intake and at the time of trial. She voluntarily relinquished her parental rights to F.S. At trial, she informed the court that she was abusing methamphetamine while she was dating Scoggins and that Scoggins knew of her drug use in 2011. Smith also testified that her mother, Cindy Smith, began using drugs in early 2012 and that she and Scoggins were allowing Cindy to take care of J.W.S. According to Sarah Doke, the guardian ad litem appointed to protect J.W.S. and F.S., Cindy knew Smith was using drugs while J.W.S. was living with her.

J.W.S.'s foster mother, Leetha Riley, also knew Smith and was well aware of her problem with drugs. Riley lived across the street from Cindy and noticed that Smith and Scoggins would leave for a few days after dropping off the child. During these times, Cindy would bring J.W.S. to visit with Riley and her husband. As a result of the Department's intervention, J.W.S. was voluntarily placed with Riley and her husband, and Smith and Scoggins both consented to the Rileys' appointment as J.W.S.'s permanent managing conservators.

Kyle Henson, an investigator with the Wood County Sheriff's Office, testified that he was familiar with Scoggins' criminal history given that he had accumulated "19 jail incidents in the Wood County Jail" alone. According to Henson, Scoggins was an alcoholic. He (1) had

---

[2]As a result of a mediated settlement agreement, the trial court appointed Scoggins as a possessory conservator of J.W.S. Accordingly, this appeal does not concern J.W.S. Also, Smith testified at trial that while Scoggins believed J.S. to be his child, he was not J.S.'s father. J.S. was not included in the Department's suit because paternal family members were already seeking custody of J.S. in Rains County.

several arrests for public intoxication, (2) was convicted of driving while intoxicated (DWI) misdemeanors on June 18, 2000, and March 17, 2001, and (3) was placed on community supervision following a conviction for felony DWI on January 2, 2002. In 2005, Scoggins' community supervision for his felony DWI was revoked, and he was sentenced to three years' imprisonment. After he was released, Scoggins was placed on deferred adjudication community supervision on November 14, 2008, for burglary of a building—a state jail felony. In October 2011, Scoggins was convicted of theft of property by check in an amount greater than $20.00, but less than $500.00, and he was again placed on community supervision. However, he was arrested in March 2012 when Smith was approximately three and one-half months pregnant with F.S, and his community supervision was revoked in July 2012.

In August 2012, (1) Scoggins was sentenced to eighteen months' confinement in state jail following a conviction of unauthorized use of a motor vehicle; (2) Scoggins was sentenced to one year in a state jail facility following a conviction of theft of property in an amount greater than $1,500.00, but less than $20,000.00; and (3) Scoggins' community supervision for the 2008 burglary of a building offense was revoked, he was adjudicated guilty, and he was sentenced to eighteen months' confinement in a state jail facility. F.S. was born on August 24, 2012, and the Department became involved in the case shortly thereafter. Scoggins was given credit for time he spent in jail from March 30 through August 16, 2012. Scoggins was released from incarceration in October 2013 and was able to meet then one-year-old F.S.[3]

---

[3]F.S.'s foster parents were Keith and Susan Brewer. Keith testified that F.S. was three weeks old when she came to live with them, that F.S. considered the Brewers to be her family, and that they intended to adopt the child. Keith testified that Scoggins had only missed two or three weeks of visitation with F.S. since his release from confinement.

7

Laci Alexander, the Department's conservatorship caseworker, met Scoggins after he was released on October 4, 2013, and developed a family plan for him, which included psychological assessment and counseling. Doctor Eugene Winsted, III, a licensed forensic psychologist, conducted Scoggins' initial psychosocial assessment. Winsted testified that Scoggins, who had been physically abused as a child, showed paranoid, antisocial, and dependent personality features. Winsted noted that Scoggins had a long history of alcohol abuse and that he had attended substance abuse treatment programs in 2002 and 2005. According to Winsted, Scoggins, who had once attended special education classes for math and English, was functioning "in the borderline range of intelligence." Winsted did not believe that Scoggins' range of intelligence alone would have a significant negative impact on his ability to parent, but was concerned that Scoggins expressed a rigid parenting style and might not be empathetic to children's needs. Winsted recommended further counseling.

Stenet Palmer Frost, a licensed professional counselor, counseled Scoggins and described him to be in a state of crisis. According to Frost, Scoggins admitted that he was a heavy drinker and an alcoholic, that he had been in and out of county jail since he was nineteen years old, and that he had never maintained a long and stable period of employment.[4] Scoggins, who was unemployed from the time of his release until January 14, 2014, had moved back into his mother's home.[5] Frost testified that Scoggins had custody of none of his four children and that

[4]Scoggins told Frost that he had been arrested for traffic tickets and for failure to pay child support.

[5]Catherine Louis Crain, Scoggins' mother, testified that Scoggins was living with her. She described Smith as a "total screw-up" who is not allowed at her house. Crain's home did not pass a home study because Crain worked two jobs and her main plan for taking care of F.S. was to have Scoggins look after the child. However, Scoggins was in jail at the time of the home study.

he was depressed. Frost stated, "I fully believe [Scoggins] was aware of [Smith's] less-than-positive behavior," but ignored it. Frost noticed that Scoggins kept his appointments and believed that he was showing a readiness and willingness to change.

However, on December 10, 2013, Scoggins was again arrested and indicted for organized retail theft, including theft of beer. This arrest undermined Frost's belief that Scoggins was ready and willing to change. Nevertheless, Frost believed that Scoggins should be given the opportunity to look after F.S.

On January 14, 2014, Scoggins found employment with Latshaw Drilling out of Tulsa, Oklahoma. His employment required him to travel to Andrews, Texas, to work in an oil field for two weeks at a time. The job paid $24.00 an hour and would allow Scoggins to eventually provide health benefits for his children.

Scoggins had been working for a little over a month when the Department's case came to trial on February 21, 2014. Alexander testified that while Scoggins had completed parenting classes and counseling, he (1) had failed to seek substance abuse treatment, (2) had missed a few opportunities to visit with J.W.S. and F.S., and (3) had continued his sexual relationship with Smith despite warnings that such conduct could undermine his case by suggesting that he would continue to allow Smith to endanger F.S.[6] Alexander was mostly concerned that Scoggins had

---

[6]Alexander also testified that she asked Scoggins to submit to a random drug test on January 14, 2014, that Scoggins failed to report for the test, and that the Department's policy equated the missed drug test with a positive drug test. However, Alexander admitted that she was later made aware that Scoggins was working in Andrews, Texas, on January 14, 2014.

9

not yet provided any plan as to how he was going to care for F.S.[7] Alexander speculated that Scoggins knew Smith was several months pregnant before he went to jail, but still continued engaging in criminal activity and testified that she believed Scoggins knowingly committed the Section 161.001(D) and (E) predicate offenses. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E).

By the time of trial, J.W.S. had remained with the Rileys for approximately one and one-half years. Riley testified that J.W.S. could not use his hands to grip objects and was unable to talk when he arrived in their home at four years old. Medical treatment revealed that J.W.S. was "tongue-tied," which required minor surgery to clip his tongue so that he could stick his tongue out and raise it in order to speak. J.W.S. was also reluctant to visit or make eye contact with others and was diagnosed with autism. Riley testified that J.W.S. was in therapy and was improving dramatically.

Doke testified that J.W.S.'s psychologist believed that his behavioral problems were linked to neglect during his early childhood. She reflected on the fact that Scoggins left J.W.S. with Smith even though, according to Smith's testimony, he knew by at least 2011 that Smith was on drugs. Doke highlighted the fact that F.S. had not met Scoggins until she was over one year old. Referring to his most recent arrest, Doke opined that Scoggins had not taken advantage of the six-month extension the trial court granted him so that he might get his affairs in order before facing trial. Doke recommended that Scoggins' parental rights be terminated.

---

[7]Alexander claimed that Scoggins had not maintained stable housing. However, the record shows that he was living with his mother and that the main reason why the home study was denied was because Scoggins, who would be the primary caretaker, was in jail.

10

Scoggins[8] argued that, although his criminal history was extensive, he had no family violence or assault charges. At trial, Smith testified that Scoggins was always employed while he took care of J.W.S. and that he was a good father. Riley testified that Scoggins loved his children, but that she believed he would be unable to provide for F.S.

On March 11, 2014, the trial court found that the Section 161.001(1)(D) and (E) predicate requirements were met, and Scoggins' parental rights to F.S. were terminated.[9]

## III. Sufficient Evidence Supports the Trial Court's Finding that Scoggins Engaged in a Statutory Ground for Termination

Only one predicate finding under Section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *A.V.*, 113 S.W.3d at 362; *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.); *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.). "'If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights.'" *K.W.*, 335 S.W.3d at 769 (quoting *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.)).

The Department alleged that Scoggins engaged in conduct which endangered F.S.'s physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(E). Endanger "means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment." *E.N.C.*, 384 S.W.3d at 803. It "'means to expose to loss or injury.'" *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (quoting *Tex. Dep't of*

---

[8]Scoggins did not testify at trial.

[9]The trial court relied heavily on the fact that Scoggins was not seeking reunification with the child but wanted someone else to take care of the child as long as he could remain the child's possessory conservator.

*Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).  This statutory ground for termination "'refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act.'"  *Id.* at 366–67 (quoting *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied)).  "'The conduct to be examined includes what the parent did both before and after the child was born.'"  *Id.* at 367 (quoting *S.K.*, 198 S.W.3d at 902); *see E.N.C.*, 384 S.W.3d at 804–05.  "To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct."  *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet) (citing *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ); *E.N.C.*, 384 S.W.3d at 803; *N.S.G.*, 235 S.W.3d at 367).  However, termination under this ground "must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required."  *Perez*, 148 S.W.3d at 436 (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.)); *see Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533–34 (Tex. 1987); *N.S.G.*, 235 S.W.3d at 367.  "The specific danger to the child's well-being need not be established as an independent proposition, but may be inferred from parental misconduct."  *Perez*, 148 S.W.3d at 436 (citing *In re N.K.*, 99 S.W.3d 295, 300 (Tex. App.—Texarkana 2003, no pet.)).

"Endangerment can . . . include knowledge that a child's mother abused drugs."  *In re U.P.*, 105 S.W.3d 222, 234 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (citing *In re M.J.M.L.*, 31 S.W.3d 347, 351–52 (Tex. App.—San Antonio 2000, pet. denied)).  The undisputed evidence in this case demonstrated that Smith was a drug addict who used illegal

drugs before and throughout her pregnancy with F.S. By 2011, Smith testified that Scoggins knew of her drug use and, therefore, the danger it presented to F.S. Smith's lengthy addiction was noticed by Cindy, also a drug addict, and by Riley. Frost indicated that while Scoggins was aware of Smith's "less-than-positive behavior," he chose to look the other way instead of forcing Smith to seek help. This evidence was sufficient for the trial court to find that Scoggins knew of Smith's drug use during the pregnancy, but did nothing to stop it. Scoggins' omission—the failure to take any action to protect F.S. from Smith's drug abuse—which occurred throughout Smith's pregnancy, was both legally and factually sufficient to support the trial court's finding that Scoggins engaged in conduct that endangered F.S. *See id.*; *In re S.K.A.*, No. 10-08-00347-CV, 2009 WL 2645027, at *9 (Tex. App.—Waco Aug. 19, 2009, no pet.) (mem. op.) (finding same omission sufficient to establish statutory predicate under ground D).

Yet, Scoggins argues that he was jailed in March 2012, spent a majority of Smith's pregnancy in jail, and might not have known at the time of his confinement that Smith was pregnant or that he was the child's father. This argument has previously been rejected. In a similar case, Father began a sexual relationship with Mother even though he was aware that Mother used drugs. *In re J.W.*, 152 S.W.3d 200, 203 (Tex. App.—Dallas 2004, pet. denied). Unbeknown to Father, Mother became pregnant. *Id.* Father was imprisoned in May, when Mother was approximately two months' pregnant, and did not learn of her pregnancy until October. *Id.* Mother continued to use drugs throughout her pregnancy. *Id.* Child was born in December. *Id.* On those facts, our sister court wrote that because Section 161.001(1)(E) looks to conduct occurring both before and after the child is born, a "parent need not know of the child's

13

existence in order to support a finding under subsection (E) . . . . Rather, it is sufficient that the child is exposed to loss or injury." *Id.* at 205 (citing *In re M.D.S.*, 1 S.W.3d 190, 198 (Tex. App.—Amarillo 1999, no pet.) (finding conduct before determination of paternity can be sufficient to support termination)). Moreover, given that Smith was three and one-half months pregnant at the time Scoggins was jailed, the trial court could reasonably find that Scoggins was aware of the pregnancy.

Also, evidence of how a parent has treated other children is relevant in determining whether a course of conduct has been established under ground E. *In re K.R.G.*, No. 02-12-00384-CV, 2013 WL 3179498, at *20 (Tex. App.—Fort Worth Mar. 21, 2013, pets. (2) denied) (mem. op.) (citing *In re D.T.*, 34 S.W.3d 625, 636–37 (Tex. App.—Fort Worth 2000, pet. denied)). The evidence demonstrated that Scoggins had been unable to care for any of his children. Although Smith knew that Cindy was a drug addict, Scoggins and Smith often left J.W.S. in her care. At four years old, J.W.S. was unable to speak due to a malformation which required surgery, was unable to grip objects, and experienced behavior problems that were thought to stem from neglect, possibly caused, in part, by Scoggins' incarceration.

"'[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child.'" *J.L.B.*, 349 S.W.3d at 848 (quoting *N.S.G.*, 235 at 367–68). Thus, "intentional criminal activity which expose[s] the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child." *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) (per curiam) (citing *Allred v. Harris Cnty. Child Welfare Unit*, 615 S.W.2d 803, 806

14

(Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.)). Yet, imprisonment, standing alone, does not constitute engaging in conduct which endangers the physical or emotional well-being of the child. *J.W.*, 152 S.W.3d at 205. "It is, however, a fact properly considered on the issue of endangerment." *Id.* (citing *Boyd*, 727 S.W.2d at 533–34). "The petitioner need not show that imprisonment was a result of a course of conduct that endangered the child." *Id.* Rather, it must only be shown that imprisonment was a part of a course of endangering conduct. *Id.* Thus, if the evidence, including imprisonment, proves a course of conduct that has the effect of endangering the child's physical or emotional well-being, a finding under subsection (E) is supportable. *Boyd*, 727 S.W.2d at 533–34.

Scoggins had an addiction to alcohol and is a self-proclaimed alcoholic. As a result of his addiction, he was arrested several times for alcohol-related offenses. Scoggins had been in and out of jail from a young age. Although he was placed on deferred adjudication community supervision for burglary of a building and regular community supervision for theft by check, Scoggins committed additional offenses in March 2012, which led to (1) his confinement at a time when Smith was approximately three and one-half months' pregnant, (2) the revocation of his theft-related community supervision, (3) an adjudication of guilt on the burglary charge, and (4) additional criminal convictions for unauthorized use of a vehicle and theft of property.[10]

---

[10]"Drug addiction and its effect on a parent's life and ability to parent may establish an endangering course of conduct" by a parent sufficient to support a petition to terminate parental rights because "'conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child.'" *Perez*, 148 S.W.3d at 436; *J.L.B.*, 349 S.W.3d at 848 (quoting *N.S.G.*, 235 at 367–68). Although Scoggins was an alcoholic, he failed to complete the substance abuse treatment that was a part of his family plan. Even though no crime had been proven at the time of trial, the record showed that Scoggins had been indicted by a grand jury for the alleged December 2013 theft of beer. The trial court could have determined that Scoggins' alcoholism and pattern of incarceration as a result of his addiction subjected F.S. to a life of uncertainty and instability.

Scoggins' incarceration limited his ability to visit with or provide for his children, forced him to leave J.W.S. in Smith or Cindy's care, notwithstanding their association with illegal drugs, and limited his ability to personally ensure that Smith remained drug free during her pregnancy beyond notifying the Department or law enforcement.

After reviewing all of the evidence in both the light most favorable to the findings and in a neutral light, we find that the trial court could have reasonably formed a firm belief or conviction that Scoggins engaged in conduct which endangered F.S.'s physical or emotional well-being. Therefore, we find the evidence legally and factually sufficient to support the termination of Scoggins' parental rights to F.S.

## IV.    Conclusion

We affirm the trial court's judgment.


                                            Jack Carter
                                            Justice

Date Submitted:     June 19, 2014
Date Decided:       July 2, 2014