

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-18-00077-CV

IN THE INTEREST OF M.M., III, AND M.M., CHILDREN

On Appeal from the 76th District Court
Camp County, Texas
Trial Court No. CPS-17-02988

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

Ella Shaw appeals from the trial court's order terminating her parental rights to her two children, six-year-old M.M., III, and four-year-old M.M.[1] On appeal, Shaw contends that the evidence was legally and factually insufficient to support the trial court's findings that she (1) knowingly placed or knowingly allowed her children to remain in conditions or surroundings which endangered their physical or emotional well-being and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical and emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E) (West Supp. 2018).[2] Because we find sufficient evidence supports at least one finding of a statutory ground for termination of Shaw's parental rights, we affirm the trial court's judgment.

## I.      Background

Stephanie Castro, an investigator for the Texas Department of Family and Protective Services (Department), was assigned on September 10, 2017, to investigate the case involving M.M. and M.M., III. According to Castro, the initial allegations involved an alleged altercation between Shaw and an older son, Ray.[3] At the time of the altercation, Shaw was living in the home of Mac Smith, a known drug dealer. There was also an allegation that Shaw might have been

---

[1]We refer to the children by their initials and to the adults by fictitious names in order to protect the children's privacy. *See* TEX. FAM. CODE ANN. § 109.002(d) (West Supp. 2018).

[2]Shaw also contends that the evidence was legally and factually insufficient to support the trial court's finding that (1) she failed to comply with the provision of a court order that specifically establish the actions necessary for the parent to obtain the return of the child, (2) she had been convicted of sexual assault, and (3) she used a controlled substance. *See* TEX. FAM. CODE. ANN. § 161.001(b)(1)(L), (O), (P) (West Supp. 2018).

[3]Ray is not involved in the pending case.

under the influence of an unknown drug. Based on those allegations, Castro, along with a law enforcement officer, visited Shaw's home. While there, Castro attempted to review the allegations with Shaw. According to Castro, "[Shaw] didn't want to hear anything from me. She said that I need to get a court order." Castro continued, "[Shaw] said any further action needed to go through the court system." At the time of the altercation being investigated, both M.M. and M.M., III, were present in the home.

Following her visit, Castro obtained a court order requiring Shaw to participate in services, along with an order to perform drug tests on M.M. and M.M., III. The children were tested on October 3, 2017. The results revealed that M.M. was positive for methamphetamine and cocaine,[4] and M.M., III, tested positive for methamphetamine. At the time, Shaw refused to be tested for drugs. Pursuant to the children's positive drug test results, Castro began initial removal proceedings.

Pursuant to a background investigation, Castro learned that Shaw had a prior criminal history that included, among other things, assault and theft charges. Castro also was aware that Shaw had been the subject of prior investigations by the Department.[5] In addition, Castro learned that Smith, the owner of the home in which Shaw and the children were living, had an "extensive drug history" and was, at that time, in prison due to violating the conditions of community supervision stemming from a drug-related conviction. Castro explained that Shaw married Smith while he was in jail, just before Smith's transfer to prison. Castro stated that the fact Shaw married

---

[4]According to Castro, M.M.'s test results showed that she had been exposed to "an extremely high amount" of drugs.

[5]Castro recalled at least three prior Department investigations involving Shaw and her children.

Smith, despite his history and involvement with drugs, caused her concern about Shaw's judgment and her ability to care for her children.

Castro explained that the children had lived with their father in Tennessee for about a year before returning to live with Shaw.[6] Castro conceded that she did not know how much time had passed between the time the children returned from Tennessee and the time they were removed from Shaw's care.[7] According to Castro, however, Shaw had been solely "responsible for the children during the time period that the drugs would have been in their system[s] or entered their system[s]."

Ronnett Toliver, the children's conservatorship worker, stated that she reviewed the Department's service plan with Shaw several times, and Shaw indicated she understood what was expected of her if she wanted her children returned to her. According to Toliver, on November 6, 2017, Shaw submitted to a drug test, which reflected positive results for methamphetamine and amphetamines. Toliver stated that Shaw was ordered to participate in and complete parenting sessions at the Children's Advocacy Center, but she was unsuccessful in doing so. In addition, Shaw was ordered to participate in and complete individual counseling with Stennett Frost, which she also failed to do. Likewise, Shaw failed to keep in contact with Toliver as required by the Department's service plan. Shaw did not notify Toliver regarding change of residence, nor did she notify her when she became the subject of criminal allegations.[8] According to Toliver, Shaw

---

[6]Shaw testified that the children may have tested positive for drugs because they were exposed to them while they had been in their father's care.

[7]Castro stated that Shaw told her that the children had returned in the early part of August.

[8]Toliver stated that Shaw informed her, well after the fact, that she had been arrested on several occasions.

4

did not demonstrate that she had the ability to provide her children with food, clothing, or the basic necessities, nor did she maintain stable employment while Toliver was her caseworker.

In regard to random drug testing, Toliver stated that Shaw "never went to any of them that [she] asked her to go to." When asked whether Shaw "completed or even really worked any of the services on her service plan," Toliver answered that Shaw had not done so. According to Toliver, Shaw cancelled many of her scheduled visitations with her children, or she would simply fail to attend the scheduled visitation. Around February 2018, after Shaw behaved inappropriately during a visit with the children,[9] the trial court suspended her visits until she produced a negative drug test. Toliver stated that Shaw did not submit to the court-ordered testing.

On March 15, 2018, Jamie Brown, another conservatorship worker, was assigned to oversee the remainder of Shaw's case. Brown testified that during her time as the children's caseworker, she learned that Shaw had been incarcerated as a result of a charge of child endangerment involving M.M. and M.M., III. On April 11, 2018, and May 2, 2018, Brown asked Shaw to submit to a drug test, but Shaw refused to comply with her requests. However, on May 10, 2018, Shaw submitted to an oral swab test to determine if she had been using drugs. The results of the test showed that she was positive for methamphetamine and amphetamines. When Brown asked Shaw to explain the results, Brown said that Shaw "denied testing positive for meth and amphetamines." Brown continued, "She did admit that she smoked marijuana and that she had smoked that morning prior to the visit."

---

[9]According to Toliver, while Shaw was visiting with her children, she described in detail that M.M.'s father had choked her.

5

On May 15, 2018, Shaw submitted to a urinalysis test, which also resulted in positive results for methamphetamine, marihuana, and amphetamines. On June 20, 2018, and August 7, 2018, Brown asked Shaw to submit to another drug test; however, Shaw failed to appear for either test. According to Brown, despite being ordered to refrain from the use of drugs, Shaw's drug tests never returned with results reflecting that Shaw did not have illicit drugs in her system. Moreover, Shaw never sought drug treatment, did not complete parenting classes, did not participate in individual counseling, did not stay in contact with Brown, and did not demonstrate to Brown that she could provide a safe, stable home environment for the children.

At the time of the final trial on the merits, Brown did not know where Shaw was residing, but she was aware that Shaw had been in relationships with Smith and Jack Mitchell, both of whom were known drug users and drug dealers. Brown stated that she was aware that Shaw had been arrested for (among other things) possession of a controlled substance. In addition, Brown knew that during the course of the case, Shaw had been incarcerated on numerous occasions. According to Brown, Shaw did not "work any of her services" during the time she had been released from confinement.

Shaw testified that she was currently living with an individual named Patty Rich, who was also helping her find appropriate housing for herself and her children. According to Shaw, she had only lived with Rich for a short time and was required to move from a prior residence "because CPS told [her] that [she] couldn't reside where [she] was residing at." Shaw explained that she had been raised in a foster home until she turned eighteen years of age. When asked if she had had a traumatic childhood, Shaw responded, "Yes, kind of."

6

Shaw stated that she had attended four parenting classes and then explained why she was unable to attend the remaining classes.[10] She acknowledged, however, that she had been ordered to attend the classes over a year ago. Shaw said she had recently been assigned a new counselor and had completed two sessions, including a psychosocial assessment.[11] According to Shaw, her required counseling had been "thr[own] off" due to a change in her work hours.

Shaw stated that she had been attending an addiction recovery program, explaining that she had gone to sessions every week from the twenty-fourth of the previous month to the fourteenth of the current month. She stated that she had attempted to sign up for a long-term program, but that there was no available space for her. According to Shaw, she was refraining from spending time with individuals who had criminal histories or drug problems. She also maintained that as of June 2018, she had used neither marihuana nor methamphetamine. Shaw believed that she had made progress on her services plan and that she wanted additional time to continue to do so. She stated, however, that she did not understand the importance of completing the required drug and alcohol evaluation.

---

[10]Shaw stated that she could not locate the meeting place and had run out of gas on the way to a meeting.

[11]On March 10, 2018, Stennett Frost, a licensed professional counselor, performed a psychosocial examination on Shaw. During the examination, Shaw informed Frost that she had a substance-abuse history and that she began using marihuana at the age of twelve. Shaw also reported that she was addicted to both marihuana and alcohol. She claimed, however, that she had been sober for the past four years. Although Shaw admitted marihuana use, she denied ever using methamphetamine. Frost's notes reflected, "[Shaw is] emotionally all over the place and it is suspected that [she] may still be actively using." According to Frost, Shaw had failed to accept responsibility for her actions and did not believe it was her fault that the children had been placed with the Department.

Frost explained that Shaw had been required to participate in individual counseling, using trauma-based techniques to address her past life experience and sudden loss of her mother. Shaw was also required to demonstrate an ability to properly parent her children and to complete her family services plan. Frost had attempted to set up counseling sessions with Shaw, but Shaw failed to meet with her at the designated appointments. Because of Shaw's failure to attend the counseling sessions and Frost's inability to make contact with her, Frost discharged her from counseling.

Following trial, the court terminated Shaw's parental rights, finding by clear and convincing evidence, among other things, that (1) termination was in the children's best interests, (2) Shaw had knowingly placed or had knowingly allowed her children to remain in conditions or surroundings which endangered their physical or emotional well-being, (3) she had engaged in conduct or knowingly placed her children with persons who engaged in conduct that endangered their physical or emotional well-being, (4) she failed to comply with the court order that specifically established the actions necessary for her to obtain the return of the children, (5) she used controlled substances, and (6) she failed to complete a court-ordered substance abuse treatment program. This appeal followed.

## II.    Discussion

Shaw contends that the evidence is legally and factually insufficient to support termination of her parental rights.[12]  Shaw argues that "[a]lthough there is evidence that the children were exposed to illegal drugs, there is no evidence to link that to [her]."  She further argues that "[e]vidence of [her] violation of court orders was limited and incomplete."  Shaw also claims that "although there was evidence of [her] methamphetamine use, it was only after the children were removed."

"The natural right existing between parents and their children is of constitutional dimensions."  *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  Indeed, parents have a fundamental right to make decisions concerning "the care, custody, and control of their children."  *Troxel v.*

---

[12]Shaw does not contest the trial court's finding that it was in the children's best interests to terminate her parental rights.

*Granville*, 530 U.S. 57, 65 (2000). "Because termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). This Court is therefore required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *Id*. at 500. "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20).

To terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2018); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" TEX. FAM. CODE ANN. § 101.007 (West 2014); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). This standard of proof necessarily affects our review of the evidence.

In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder could reasonably have formed a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.). We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding if a reasonable fact-finder could do so and disregarded contrary evidence and witnesses that the fact-

9

finder could have reasonably disbelieved or whose credibility could reasonably be doubted. *J.P.B.*, 180 S.W.3d at 573.

In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that disputed evidence in favor of its finding. *Id*. at 28. If, in weighing the disputed evidence, the fact-finder could have reasonably resolved the conflicts to form a firm conviction that allegations concerning the grounds for termination were true, then the evidence is factually sufficient and the termination findings must be upheld. *Id*. at 18–19. In applying this standard in light of the "clear and convincing" threshold required by Section 161.001 of the Texas Family Code, we must be careful not to "be so rigorous that the only fact[-]findings that could withstand review are those established beyond a reasonable doubt." *In re R.A.L.*, 291 S.W.3d 438, 443 (Tex. App.—Texarkana 2009, no pet.) (quoting *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam)).

Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, "the rights of natural parents are not absolute; protection of the child is paramount." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26).

The trial court found, among other things, that Shaw had engaged in conduct which endangered the children's physical or emotional well-being or had knowingly placed the children with persons who engaged in such conduct. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Under ground (E), the term endanger "means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment, but that endangering conduct need not be directed at the child." *E.N.C.*, 384 S.W.3d at 803. To endanger "means to expose to loss or injury." *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (citations omitted)). "Ground (E) 'refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act.'" *Id*. at 366–67 (quoting *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied)). Moreover, termination under ground E requires more than a single act or omission. Instead, a "voluntary, deliberate, and conscious course of conduct by the parent" must be established. *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.).

Beginning with the physical altercation between Shaw and her older son, Shaw acted inappropriately while her children were present in the home. Shaw was actively using drugs and surrounding herself with individuals who were either drug users or drug dealers. In fact, Shaw was jailed on several occasions as a result of her alleged criminal conduct. Shaw's drug use

11

continued unabated for much of the pendency of the case. She admitted to using methamphetamine and marihuana until June 2018.[13]

Although she had been ordered to submit to drug testing, Shaw failed to do so on numerous occasions, and when she ultimately submitted to such testing, the results were positive for methamphetamine and marihuana. In spite of being ordered to attend a drug treatment program, Shaw failed to attend most of the meetings and offered unacceptable excuses as to why she was unable to do so. The evidence also showed that Shaw did not understand the need for attending and completing a drug treatment program. In addition to her extensive history of drug use, Shaw chose to live with Smith, who also had a history of not only taking drugs, but also selling them. Moreover, the fact that she married Smith while he was in jail, due to a drug-related conviction, raises significant concerns about her judgment and her ability to properly care for her children. Most notably, however, the children were found to have had drugs in their systems at a time when they were residing with Shaw and while Shaw had sole responsibility for their welfare.[14]

"Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001[b](1)(E)." *In re A.L.*, 06-16-00050-CV, 2014 WL 5204888, at *7 (Tex. App.—Texarkana Oct. 8, 2014, no pet.) (mem. op.) (quoting *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex.

---

[13]Shaw points out that in September 2018, she tested negative for the use of drugs. Considering the remaining evidence, a single negative test result does not compel a different result in this case.

[14]On appeal, Shaw contends the children "could have been exposed to drugs" while they were in Tennessee with their father. Shaw's contention is based on nothing more than speculation. Contrary to her conclusory claim, the evidence shows that the children were in Shaw's care immediately prior to submitting to drug testing. Taking into consideration the remaining evidence, the trial court could have reasonably concluded that the children's positive drug test results were directly related to being in the care of their mother.

App.—Houston [1st Dist.] 2009, pet. denied)). "Drug use and its effect on a parent's life and [her] ability to parent may establish an endangering course of conduct." *In re J.L.B.*, 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.) (quoting *N.S.G.*, 235 S.W.3d at 367–68). "Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child." *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.).

Here, the evidence clearly shows that Shaw repeatedly used illegal drugs and engaged in criminal activity, plainly in violation of the trial court's order. Moreover, her behavior during the pendency of the case supports a finding that Shaw refused to change her inappropriate and illegal behavior regardless of the likely consequence of the loss of her parental rights to both of the children the subject of these proceedings. "Only one predicate finding under Section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.) (citing *A.V.*, 113 S.W.3d at 362); *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.). "If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights." *K.W.*, 335 S.W.3d at 769 (quoting *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.)).[15]

---

[15]Clearly, Shaw did not comply with the trial court's order when she, among other things, (1) refused to submit to drug testing, (2) failed to attend counseling sessions, (3) failed to attend and complete a drug treatment program, (4) engaged in criminal behavior, (5) used illegal drugs, and (6) failed to visit with her children in an appropriate manner. Consequently, the trial court was within its discretion to terminate Shaw's parental rights based on multiple statutory violations.

13

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have reasonably formed a firm belief that Shaw engaged in conduct that endangered the physical and emotional well-being of M.M. and M.M., III. *See In re A.A.*, No. 06-14-00060-CV, 2014 WL 5421027, at *4 (Tex. App.—Texarkana Oct. 23, 2014, no pet.) (mem. op.) ("Here, the evidence paints a long history of irresponsible choices which were ultimately detrimental to the emotional and physical well-being of Scott's children."). We also find, viewing all the evidence in a neutral light, that the trial court could have reasonably formed a firm belief or conviction that Shaw had endangered the physical and emotional well-being of the children. *See C.H.*, 89 S.W.3d at 25. We, therefore, conclude that the evidence was legally and factually sufficient to support the termination of Shaw's parental rights under ground (E).

Accordingly, we overrule Shaw's sole point of error.

## III. Conclusion

We affirm the trial court's judgment.


Bailey C. Moseley
Justice


Date Submitted:     December 20, 2018
Date Decided:       December 28, 2018


14