# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00240-CV

---

**A. M., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 146TH DISTRICT COURT OF BELL COUNTY**
**NO. 312,563-B, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A.M. (Mother) appeals from the trial court's final decree of termination.[1] Following a jury trial, the trial court terminated Mother's parental rights to her children, A.W. and S.N., as well as the parental rights of S.N.'s biological father, J.N., and appointed the children's foster parents and maternal grandmother (Grandmother) as joint managing conservators.[2] The trial court also appointed A.W.'s father, C.W., as a possessory conservator of A.W. In two issues, Mother challenges the legal and factual sufficiency of the evidence supporting the jury's predicate-ground findings for termination, *see* Tex. Fam. Code § 161.001(b)(1)(D) (endangering conditions or surroundings), (E) (endangering conduct), and its

---

[1] We refer to A.M. by her initials or as Mother and to the children by their initials. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. We refer to other parties to the suit by their initials or their relationship to the children at issue.

[2] The foster parents were appointed primary conservators.

finding that termination of Mother's parental rights was in the children's best interest, *see id.* § 161.001(b)(2). For the following reasons, we affirm the trial court's order of termination.

## BACKGROUND

Mother and J.N., who first dated in high school, began seeing each other again in July 2018. In September 2018, J.N. moved into Mother's apartment, where she lived with her three children from previous relationships: J.M., A.W., and S.W. In November 2018, Mother became pregnant by J.N. and, in July 2019, gave birth to a daughter, S.N.

In the early morning of September 22, 2019, police arrived at the apartment in response to a report of a young child in cardiac arrest. Officers with the Temple Police Department (TPD) found S.W. unresponsive and lying on the floor of a bedroom; she was pronounced dead at the scene. J.N. was subsequently convicted of capital murder and sentenced to life imprisonment. Mother has been incarcerated since December 2020 and is awaiting trial on a charge relating to S.W.'s death. While at the apartment, the officers also noticed bruising on A.W., and Bell County Sheriff's Department Investigator James Powell had the children taken to McLane Children's Hospital to be evaluated for injuries. At the time of S.W.'s death, J.M. was five years old, A.W. was three years old, S.W. was two years old, and S.N. was approximately two months old.

Thomas Yarrington, a special investigator with the Texas Department of Family and Protective Services (Department), met the children at the hospital and determined that they would be in immediate danger were they not removed from the residence and placed into protective custody. The following day, the Department filed an original petition in a suit affecting the parent-child relationship, seeking to terminate Mother's and J.N.'s parental rights

2

and to be appointed temporary managing conservator of the children.[3] The trial court signed an emergency order for protection and placed the children in foster care.

Approximately two months later, Grandmother filed a petition in intervention seeking to be appointed the children's sole managing conservator. The foster parents likewise filed a petition in intervention requesting that the children continue in their placement and ultimately be adopted.

A jury trial was held in November 2021. The witnesses included Yarrington; members of law enforcement who testified about the events surrounding S.W.'s death as well as J.N.'s history of child abuse and domestic violence; a sexual assault nurse examiner (SANE); C.W.; Grandmother; the children's guardian ad litem; the Department's conservatorship caseworkers; and the children's foster parents. Mother, J.N., and the children did not testify. The Department's exhibits included the removal affidavit supporting its original petition, Mother's and the children's medical records, and Mother's September 22, 2019 voluntary statement.

The evidence showed a consistent pattern of abuse by J.N. against both Mother and the children beginning shortly before Mother's pregnancy with S.N. and lasting through S.W.'s death. Grandmother testified that around August or September 2018, her daughter noticed that A.W. had what appeared to be an adult bite mark on her thigh. Mother and Grandmother took A.W. to the hospital, but when Grandmother offered to help Mother, Mother responded that she did not need any help. In a statement made to the SANE, Mother reported that J.N. began to rape her anally and vaginally in November 2018. Yarrington testified that

---

[3] J.M.'s case was subsequently severed and dismissed. Consequently, this case does not concern Mother's parental rights with respect to him.

Mother told him that around Thanksgiving of that year, J.N. choked her until she became dizzy, felt like she was going to pass out, and almost wet herself. In her voluntary statement, Mother recounted that on Christmas Day 2018,[4] she was arguing with J.N. when he put a kitchen knife against her throat from behind; twice asked, "Do you want me to hurt you"; and pulled the knife across her throat, causing a light cut or scrape. Mother also stated that J.N. anally raped her in February 2019.

Mother reported in her statement that J.N.'s physical abuse of the children worsened in June 2019, and J.N. became "more violent." He hurt his hand spanking the children and began to use a belt. He also started to strangle A.W. and S.W., punch them in their stomachs, and slap them in their faces. Mother stated that she would tell J.N. to stop, but he would threaten to hurt her. C.W. testified that he ran into Mother and the children at Walmart in July 2019 and noticed large bruises on A.W.'s and S.W.'s foreheads. When he asked Mother what had happened, she replied that the children had run into each other.

Powell testified about three incidents that occurred in the weeks before S.W.'s death. On September 12, 2019, Mother sent J.N. a text message informing him that she was hiding one of the children's injuries with makeup. On the Tuesday before S.W.'s murder, Mother took J.M. to his school's open house and while there received a Facebook message from J.N. stating that S.W. had defecated in a chair in the kitchen where the children eat. J.N. wanted Mother to clean it up and threatened that if she did not return soon, S.W. would "be in a body bag." He sent Mother a photo of S.W. with apparent belt marks across her back. Mother told Powell that when J.N. would beat the children, including on this occasion, she would have sex

---

[4] In her statement, Mother gives the year as both 2018 and 2019. Because the record shows that J.N. was arrested on September 23, 2019, we understand the former date to be correct.

4

with him to "calm him down." In her statement, however, Mother stated that J.N. anally raped her before he went to work. Powell testified that Mother told officers that two days later—three days before S.W.'s murder—she placed A.W. and S.W. in a bath and took J.M. to baseball practice. When she returned home, she noticed tearing on S.W.'s perineum. She learned through a Google search that such tearing is an indicator of sexual abuse and confronted J.N., who denied sexually abusing S.W.

Multiple witnesses testified about the largely undisputed events leading up to S.W.'s death. On the evening of September 21, 2019, Mother, J.N., and the children were preparing to run errands for S.W.'s upcoming third birthday. Around 7 p.m., A.W. came into the living room with her shoes on the wrong feet. J.N. yelled at A.W. and backhanded her across her face, knocking her to the ground. He picked her up by her arm, punched her in the stomach three times, and dropped her to the floor. S.W. then came into room. J.N. told her to put her shoes on and became angry because he did not believe that she was doing it fast enough. He picked her up by her arm, punched her three times in the stomach, dragged her to the bedroom, and choked her on the bed for approximately two minutes until her eyes rolled back. During the assault, Mother told J.N. to stop.[5]

After choking S.W., J.N. left the residence for approximately 30 minutes to buy toys. Mother changed S.W.'s diaper and moved her to the bed where she lay quietly. When J.N. came back, he put S.W. on his lap, but she vomited, and he threw her off of him onto the floor. On J.N.'s advice, Mother gave S.W. ibuprofen. Powell testified that Mother related that she cleaned up the vomit, cooked for J.N., and had sex with him to calm him. J.N. woke from a nap

---

[5] In her statement, Mother maintains that she also tried to pull J.N. off of S.W. but could not. Powell testified that his recollection from multiple interviews with Mother was that she had not tried to pull J.N. off of S.W.

5

around 10:30 and left for work. Mother also went to sleep but awoke around 2:00 a.m. to get a drink. S.W. came into the kitchen crying and said that she was hungry, so Mother made her pizza and gave her a bottle of tea. S.W. did not eat the pizza but drank a little. Powell testified that Mother told him that S.W. was "whimpering kind of in agony." Mother noticed that S.W.'s stomach was swollen, discolored, and hot to the touch, although the rest of her body was cold. She recorded a video of S.W. and sent it to J.N., saying that she was worried about S.W.'s condition. J.N. told her to "put that bitch back in her bed, this is what she did the last time." Powell testified that he is a paramedic and that "basically, the video that [Mother] videotaped is [S.W.] was dying . . . . [T]hat is what we call agonal respirations. They're her dying breaths."

Mother had difficulty waking S.W. and put her in the shower to try to warm her. S.W. "would not stand," and Mother instead got into bed with her. S.W.'s breathing was labored, but when Mother attempted CPR by blowing into S.W.'s nose, "brown stuff came out." Mother called 911, and TPD officers arrived in approximately two minutes and attempted resuscitation. Fire and EMS arrived a few minutes later, but both TPD officers testified that they believed that S.W. was already dead. Both also testified that an "unusual" or "long" amount of time passed from their arrival at the apartment until Mother opened the door. Mother initially told first responders that S.W. had complained of a stomachache. However, after officers noticed A.W.'s bruises and confronted Mother, she admitted that J.N.—who was not present— had beaten and choked A.W. and S.W.

Powell and the SANE testified about the extent of A.W.'s and S.W.'s injuries. Powell testified that S.W. was "covered in bruises" and that "[t]he only part of her body that did not have a bruise or an injury were the soles of her feet." He testified that her autopsy was the longest he had attended because "she had so many injuries that had to be documented." A.W.

6

was also "covered in bruises." The SANE testified that A.W. had bruises "everywhere," "across every portion of her body," and that several were life-threatening. She explained that because of the bruises' locations, there must have been multiple injuries.

Kayla Keller, the Department's conservatorship caseworker, testified that the children were not placed with family because the Department did not have all of the facts during the investigation, and J.N. was still a fugitive when the placement occurred. She also testified about Mother's progress in completing her Family Service Plan (FSP) before her incarceration. It took Mother "about five to six months before she began services." She underwent her psychological evaluation a couple of months after it was ordered but went to therapy consistently and took protective parenting and domestic-violence classes. Her evaluation noted that her "overall function is moderate," and her therapist indicated that she "did not make progress because she was playing the victim role instead of understanding the reason her children were removed." Throughout the case, Mother did not have her own apartment but stayed with individuals "who were paying the rent." According to the foster parents, A.W. did not want to see Mother, and S.N. had not expressed a preference. When Keller was J.M.'s caseworker, he likewise stated that he did not want to see Mother. Keller testified that she believes termination would be in the children's best interest because "[Mother] did not protect her children" and knowingly put them in an environment where they were abused. She added that from the reports she had read, it did not appear that Mother was exhibiting any parenting abilities.

Although the intervenors—C.W., Grandmother, and the foster parents—contested the issue of conservatorship, all testified that Mother's parental rights should be terminated. Additionally, C.W., Grandmother, Keller, and the children's guardian ad litem testified that termination of Mother's parental rights would be in the children's best interest. As Mother's

7

counsel summarized at closing argument, "These parties—all these parties, except for maybe [J.N.], want [Mother's] parental rights terminated. All of them do. [Mother] does not."

The jury found by clear and convincing evidence that: (i) Mother knowingly placed or knowingly allowed A.W. and S.N. to remain in conditions or surroundings which endangered their physical or emotional well-being, (ii) Mother engaged in conduct or knowingly placed A.W. and S.N. with persons who engaged in conduct which endangered their physical or emotional well-being, and (iii) termination of the parent-child relationship between Mother and A.W. and S.N. was in their best interest. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (2). The trial court, pursuant to the jury's findings, terminated Mother's parental rights, appointed Grandmother and the foster parents as joint managing conservators, and appointed C.W. as a possessory conservator of A.W. Mother's appeal followed.

## ANALYSIS

In two issues, Mother challenges the legal and factual sufficiency of the evidence supporting the jury's predicate-ground findings under subsections (D) and (E) of subsection 161.001(b)(1) and its finding that termination was in A.W.'s and S.N.'s best interest.

### Standard of Review

To terminate parental rights under section 161.001, the Department has the burden to prove one of the predicate grounds in subsection (b)(1) and that termination is in the best interest of the child. *See id.* § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The applicable standard of proof is clear-and-convincing evidence. Tex. Fam. Code § 161.206(a); *see In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (explaining that "[d]ue process requires the application of the clear and convincing evidence standard of proof in parental

8

termination cases"). The clear-and-convincing-evidence standard is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see* Tex. Fam. Code § 101.007 (defining "clear and convincing evidence").

Legal-sufficiency review of the evidence to support a termination finding requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

In our review of the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (citing *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)); *see In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (explaining that appellate court "should not supplant the jury's judgment with its own").

**Predicate Grounds**

Mother challenges the legal and factual sufficiency of the evidence to support the jury's findings under subsections (D) and (E)—that she (i) knowingly placed or knowingly allowed A.W. and S.N. to remain in conditions or surroundings which endangered their physical or emotional well-being and (ii) engaged in conduct or knowingly placed A.W. and S.N. with persons who engaged in conduct which endangered their physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam) (explaining that only one predicate ground is necessary to support termination of parental rights when there is also best interest finding but requiring appellate court to detail analysis for appeal challenging subsection (D) or (E) finding); *In re A.V.*, 113 S.W.3d at 362 (explaining that Department has burden to prove one predicate ground and that termination is in child's best interest).

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone," and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861, at *4 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). "Conduct that subjects a child to a life of uncertainty and instability endangers the

child's physical and emotional well-being." *Id.* (citing *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied)).

The relevant inquiry under subsection (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet denied.). "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *Id.* In contrast, the relevant inquiry under subsection (D) is whether the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home . . . is part of the 'conditions or surroundings' of the child's home under subsection (D)." *Id.* (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)); *see In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("A parent's abusive or violent conduct can produce a home environment that endangers a child's well-being. Domestic violence, lack of self-control, and a propensity for violence may be considered as evidence of endangerment." (internal citation omitted)). Because the evidence pertaining to subsections (D) and (E) is interrelated, we consolidate our review of the evidence. *See V.P.*, 2020 WL 544797 at *4 (citing *In re M.R.J.M.*, 280 S.W.3d at 503).

Mother largely confines her argument to domestic violence, contending that there is no evidence that she was a victim of abuse before her relationship with J.N. and that the Department therefore "failed to establish that she had a pattern of being involved in abusive

11

relationships and of exposing her children to domestic violence." She also emphasizes that the only testimony concerning the physical condition of the home was that "it was messy with dirty dishes piled up." With respect to evidence of abuse against the children, Mother appears to suggest that the Department failed to prove that she undertook a voluntary, deliberate, and conscious course of conduct under subsection (E), concluding only that:

> Evidence of [J.N.'s] abuse towards [Mother] and the Children during the year they were living together which escalated in June of 2021 is legally insufficient for a reasonable factfinder to form a "firm belief or conviction" that Mother engaged in conduct or knowingly placed the Children with persons who engaged in conduct that endangered the physical or emotional well-being of the Children.

We disagree. The evidence shows that from the time J.N. moved in with Mother and the children in September 2018, the children were exposed to an environment of pervasive and severe physical abuse. Powell testified that he believed that "there was mental abuse going on with the children also." As early as August or September 2018, A.W. was seen with what appeared to be an adult bite mark on her thigh. While Mother told officers that J.N. became "more violent" with J.M., A.W., and S.W. in June 2019, her statement supports a reasonable inference that violence was present in the home before that date. Yarrington testified that Mother told him that the abuse against the children occurred on "multiple occasions" and that investigators had the impression that A.W. and S.W. had been choked multiple times. He also testified that Mother stated that the abuse worsened in part because J.N. hurt his hand spanking the children and began using a belt. Powell testified that Mother "might" have also admitted to using a belt on the children, but he could not "specifically remember that."

The record shows that the abuse escalated in June 2019, not 2021. In her statement, Mother recounted that in June 2019—approximately four months before S.W.'s

12

murder—J.N. began strangling, punching, and slapping her two- and three-year-old daughters and spanking them with a belt. She stated that the week of S.W.'s death, J.N. sent her a text threatening to put S.W. "in a body bag." Powell testified that a couple of days later Mother became aware of evidence that J.N. may have sexually assaulted S.W., admitting to officers that she had confronted him about the possible sexual abuse.

Mother's argument that the evidence does not prove that she undertook a voluntary, deliberate, and conscious course of endangering conduct ignores the evidence of her inaction by placing the children in J.N.'s care and failing to protect the children from his ongoing abuse. *See* Tex. Fam. Code § 161.001(b)(1)(E) (including knowingly placing child with persons who engaged in conduct which endangered child's physical or emotional well-being); *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied) (explaining that conduct under subsection (E) includes actions and omissions). A "parent's failure to remove [herself] and [her] children from a violent relationship endangers the physical or emotional wellbeing of the children." *In re L.W.*, 609 S.W.3d 189, 200 (Tex. App.—Texarkana 2020, no pet.) (quoting *In re I.G.*, 383 S.W.3d 763, 770 (Tex. App.—Amarillo 2012, no pet.)). The evidence shows that Mother knew of the abuse against J.M., A.W., and S.W. but stayed with J.N. The TPD officers who responded to the apartment following S.W.'s death testified that Mother told them that she was aware of the abuse, had not reported it, and that J.N. "tend[ed] to focus his anger [and] frustration on the two little girls." Yarrington testified that at the hospital Mother did not "act[] as much as [he] thought she would as far as having lost a child" and that she stated "that she should possibly go to jail for not protecting her children." The SANE testified that Mother told her, "I could have done something for [S.W.] I could have saved her." She also testified that Mother stated that she tried to prevent the abuse by telling J.N. "that they're just kids, that they

13

don't understand, that he needed some more understanding. They're just babies, you need to calm down, and you need to stop." She did not believe, however, that Mother said she ever "intervened to stop this man from beating her children." Grandmother testified that Mother's apartment was "a few blocks" from a police station.

Yarrington testified that on the night of S.W.'s murder, Mother neither left the apartment nor called 911, even after J.N. beat A.W. and S.W. and choked S.W. until it appeared she passed out. She did not go for help when S.W. threw up, when her stomach became distended, or when she became lethargic and cold to the touch. When S.W. began having trouble breathing, Mother took a cell-phone video of her distress and sent it to J.N. but did not call 911. Mother is correct that "[s]he took action" and called 911 after her attempt at CPR failed. However, the officers who arrived approximately two minutes later testified that they believed S.W. was already dead by then. Asked if Mother had explained why she did not call 911 earlier that night, Powell testified that "her main excuse was that she loved [J.N.,] and she didn't want to lose him."

Mother's conduct was not limited to inaction. The evidence shows that approximately a week and a half before S.W.'s murder, Mother sent J.N. a text stating she was hiding one of the children's injuries with makeup. When C.W. asked Mother about bruises to A.W. and S.W. in July 2019, after the abuse against them had worsened, Mother replied that they had run into each other. When Grandmother offered to help Mother after the apparent bite mark on A.W. was discovered, Mother answered that she did not need any help. And when officers and paramedics responded to treat S.W. on the night of her murder, Mother initially told them only that she had complained of a stomachache, not mentioning the abuse until pressed by officers, who had seen bruises on A.W.

14

Evidence of endangering conditions, surroundings, or conduct went beyond physical—and possibly sexual—abuse of the children. Although it is unclear from the record whether the children witnessed any of the abuse against Mother, she is incorrect in arguing that domestic violence against her does not support a finding of endangerment. Under subsection (E), "[a] fact-finder 'can consider the history of abuse between the mother and the father . . . even if the children are not always present.'" *In re Z.M.*, 456 S.W.3d 677, 686 (Tex. App.—Texarkana 2015, no pet.) (quoting *In re A.V.M.*, No. 13-12-00684-CV, 2013 WL 1932887, at *5 (Tex. App.—Corpus Christi–Edinburg May 9, 2013, pet. denied) (mem. op.)). In fact, abuse by one parent against the other parent emotionally harms the child either when the child is directly present or in the parent-child relationship after the abuse has occurred. Likewise, "[a] parent's decision to continue living with someone who has committed instances of domestic violence may support an endangerment finding under subsection (b)(1)(D)." *In re O.E.R.*, 573 S.W.3d 896, 905 (Tex. App.—El Paso 2019, no pet.). "Physical violence in the home leads to an unstable and unpredictable environment for children." *Id.*

The cases cited by Mother are distinguishable. In *In re A.S.*, the court concluded that "even assuming [father's] behavior was abusive and occurred in front of the children, [mother] took responsive action to protect A.S. and D.S. by taking them out of the environment." 261 S.W.3d 76, 84 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). In *Lewelling v. Lewelling*, the court held "that evidence that a parent is a victim of spousal abuse, by itself, is no evidence that awarding custody to that parent would significantly impair the child." 796 S.W.2d 164, 167 (Tex. 1990), *subsequent mandamus proceeding sub. nom. Lewelling v. Bosworth*, 840 S.W.2d 640 (Tex. App.—Dallas 1992, no writ). Neither fits the facts of this case. The endangering circumstances here concern much more than spousal violence. Mother

15

wholly failed to take the children out of the apartment she shared with J.N. or take any action to remove J.N. from the apartment.

The evidence supporting the jury's findings under subsections (D) and (E) also concerned the children's health and the condition of the apartment. The evidence showed that the apartment was "dirty" and that Mother attempted to mislead Department investigators by cleaning only the parts of the apartment that they were likely to see. Powell described the apartment as "almost two different houses" and testified that Mother told him that "she could close off that [dirty] area and then if [investigators] came in they would see the children's area was clean." Contrary to Mother's assertion that the disorder amounted only to dirty dishes, witnesses testified that there were *no* clean dishes, that a roach was on the wall, that the children's dining table was dirty, and that "parts of [the apartment] were covered in [S.W.'s] human feces," including the chair which she had reportedly defecated on days before. Powell testified that A.W. appeared small for her age and that there was a concern about her "overall health as far as dietary and issues like that." He also testified that doctors told officers that the children were underweight.

Viewing the evidence under the applicable standards of review, we conclude that the evidence was legally and factually sufficient to support the jury's findings that Mother knowingly placed or knowingly allowed A.W. and S.N. to remain in conditions or surroundings which endangered their physical or emotional well-being and that she engaged in conduct or knowingly placed A.W. and S.N. with persons who engaged in conduct which endangered their physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d at 232–33, 237; *In re A.C.*, 560 S.W.3d at 630–31. Thus, we overrule Mother's first issue.

16

**Best Interest**

In her second issue, Mother challenges the legal and factual sufficiency of the evidence to support the jury's finding that termination of her parental rights was in A.W.'s and S.N.'s best interest. *See* Tex. Fam. Code § 161.001(b)(2).

Relevant factors in assessing the best interest of a child include: (i) the desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist the individuals seeking custody to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). No one factor is controlling, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See In re C.H.*, 89 S.W.3d at 27–28; *Pruitt*, 2010 WL 5463861, at *7.

As discussed above, there is substantial evidence in the record supporting endangerment findings under subsections (D) or (E). *See In re S.K.*, 198 S.W.3d at 902 ("Much of the evidence establishing a statutory ground for termination may also show that the best interests of the child warrant termination."). Keller, the children's conservatorship caseworker, testified that A.W. has expressed that she does not want to live with Mother. While the record

17

does not state the preference of S.N.—who was two years old at the time of trial—the evidence shows that she is closely bonded to Grandmother and her foster parents, with whom she has lived for most of her life.[6] *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("When children are too young to express their desires, the factfinder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent."). Grandmother, C.W., and the foster parents testified at length about the resources, housing, and therapy available to the children. Both Grandmother and the foster parents testified that they would ensure the children have stable, loving homes.

In contrast, as Mother acknowledges, she is currently incarcerated and facing the prospect of a lengthy prison sentence.[7] She consequently was unable at the time of trial to provide the children with permanency or stable and safe housing. As noted above, at the time of S.W.'s murder, Mother's apartment was dirty, with parts covered in feces. "Evidence of unsanitary conditions of a home may support the trial court's best-interest finding." *In re R.J.*, 579 S.W.3d 97, 119 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (quoting *In re S.T.G.*, No. 04-17-00837-CV, 2018 WL 1935488, at *2 (Tex. App.—San Antonio Apr. 25, 2018, no pet.) (mem. op.)). Following the children's removal, Mother was unable to secure housing of her own and stayed with other individuals who paid the rent. Keller testified that it did not appear as though Mother was exhibiting any parenting abilities and explained that although Mother was attending therapy before her incarceration, "the therapist stated several times that she was not

---

[6] S.N. was approximately two months old when she was removed from Mother's apartment.

[7] Grandmother testified that Mother has been charged with a first-degree felony with a possible range of punishment of five to ninety-nine years' confinement and that she believes that Mother should be in prison.

making progress, she was still playing more of the victim role versus understanding the seriousness of what happened[,] . . . [a]nd she was not following up with MHMR for her mental health needs." The children's guardian ad litem testified that he had "[n]o doubt" that mother's parental rights should be terminated and that "the longer this case has gone on the more information that's come out, that's actually strengthened and not weakened [his] position" that termination is in the children's best interest.

Viewing the evidence under the legal-sufficiency standard of review, we conclude that the jury could have reasonably formed a firm belief or conviction that terminating Mother's parental rights was in A.W.'s and S.N.'s best interest. *See* Tex. Fam. Code § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630–31; *In re J.F.C.*, 96 S.W.3d at 266. Further, viewing the evidence under the factual-sufficiency standard of review, we conclude that the evidence is such that the jury reasonably could have formed a firm belief or conviction that termination of Mother's parental rights was in A.W.'s and S.N.'s best interest. *See In re A.C.*, 560 S.W.3d at 631. Thus, we conclude that the evidence was legally and factually sufficient to support the jury's best interest finding. We overrule Mother's second issue.

**Conservatorship**

In a section titled "Conservatorship" within the portion of Mother's brief addressing her best-interest claim, she requests that the foster parents' appointment as joint managing conservators be reversed and asserts that her "challenge to the conservatorship by the foster parents, and the Trial Court's post-trial possession and access order, is subsumed within her appeal of the termination order." To the extent that Mother intends to raise a separate and distinct issue concerning conservatorship, however, she lacks standing to do so.

19

Because we have overruled Mother's challenge to the termination of her parental rights, she has been divested of all legal rights and duties with respect to A.W. and S.N. *See* Tex. Fam. Code § 161.206(b) (providing that termination order divests parent and child of all legal rights and duties with respect to each other, with exception for right to inherit unless court orders otherwise). And as she has no legal rights pertaining to the children, she lacks standing to challenge the portions of the trial court's order appointing the foster parents as joint managing conservators of the children and awarding the foster parents possession and access of the children. *See In re Lambert*, 993 S.W.2d 123, 132 (Tex. App.—San Antonio 1999, orig. proceeding) (stating that former parents lack standing to invoke trial court's jurisdiction over managing-conservatorship issues); *Glover v. Moore*, 536 S.W.2d 78, 79–80 (Tex. App.—Eastland 1976, no writ.) (holding that termination order "results in a complete severance of the parent-child relationship" and that individual whose parental rights have been terminated "has no justiciable interest in" child's conservatorship); *In re H.M.M.*, 230 S.W.3d 204, 204–05 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (holding court lacked jurisdiction to consider mother's appeal of trial court's failure to grant sole custody to her father after it terminated her parental rights). In the absence of Mother's standing to raise a conservatorship issue, we have no jurisdiction over it. *See In re H.M.M.*, 230 S.W.3d at 205.

## CONCLUSION

For these reasons, we affirm the trial court's decree of termination.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, Kelly

Affirmed

Filed:   October 20, 2022