**Modified and Affirmed and Opinion Filed October 31, 2023**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-23-00582-CV

## IN THE INTEREST OF C.D.M., J.L.M., AND H.N.P., CHILDREN

**On Appeal from the 255th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-21-16421**

## MEMORANDUM OPINION

Before Justices Molberg, Carlyle, and Smith
Opinion by Justice Molberg

Appellant Father appeals the trial court's order terminating his parental rights to children C.D.M., J.L.M., and H.N.P.[1]  Father presents four issues in this appeal, generally challenging the sufficiency of the evidence to support the trial court's order.  The Department raises a cross-issue to correct a clerical error in the order of termination.  For the reasons explained below, we sustain the Department's issue and otherwise affirm the order of termination in this memorandum opinion.  *See* TEX. R. APP. P. 47.4.

---

[1] Although Mother's parental rights to the children were also terminated, she did not appeal to this Court.

# I. Background

This case involves the parent-child relationship between K.M. (Father) and his children C.D.M. (C.), J.L.M. (J.), and H.N.P. (H.). At the time of the final hearing in 2023, C. was seven, J. was five, and H. was two.

On October 7, 2021, the Department filed an original petition for protection, conservatorship, and termination. An affidavit accompanying the petition stated the Department received a referral on September 16, 2021, stating that J. had severe eczema that Mother had been aware of for a month yet failed to seek medical intervention. J. had "big giant open sores all over his body from head to toe." Daycare workers confirmed they previously informed the parents that J. needed to be seen by a doctor but he had not been seen. After unsuccessfully trying to meet with Mother and Father, the Department caseworker was contacted by Children's Medical Center in Dallas and informed J. had been admitted to the hospital on October 3. Among other things, the caseworker learned Mother told the hospital doctor that J. had not been to the doctor because they did not have transportation. The affidavit also included information about Mother and Father's history with the Department from 2020 for reported domestic violence and drug use.

The trial court signed the ex parte order for emergency care and temporary custody on October 7, 2021.[2] Among other things, the court found there was a

---

[2] Although proceedings regarding H. were initially separate from the case of J. and C., the two cases were eventually consolidated on December 16, 2021, when Father's paternity of H. was established. Accordingly, we discuss C., J., and H. simultaneously for clarity.

–2–

continuing danger to the physical health or safety of C., J., and H. if returned to their parents and appointed the Department as C., J., and H.'s temporary managing conservator. The court extended the order on October 21, 2021, and November 4, 2021.

On December 7, 2021, the trial court signed a temporary order requiring Mother and Father to participate in parenting classes, submit to drug tests, and follow through with recommendations made by any service provider. Supervised visitation was allowed at Department offices for one hour per week. The court appointed the Department temporary managing conservator of J., while C. and H. were returned to Mother. On May 12, 2022, and again on July 14, 2022, the trial court entered permanency hearing orders requiring Mother and Father to submit to further drug testing. On September 29, 2022, the trial court extended the dismissal date until April 8, 2023.

The trial court entered an ex parte order for emergency care and temporary custody of C. and H. on October 12, 2022; the Department was appointed temporary managing conservator of C. and H. in addition to J. According to the Department's report to the court, the Department received a new referral when it was reported that C., who reportedly had a black right eye, stated Mother struck him after he let H. fall off the couch. A temporary order was entered and the parents were ordered to submit to random drug testing, psychological evaluations, parenting classes, anger

management, and individual counseling, and to follow through with any recommendations made by any service providers.

On February 9, 2023, the trial court entered a permanency hearing order before final order in which the court, among other things, found Mother and Father had not demonstrated adequate compliance with their service plans.

Trial was conducted beginning April 6, 2023. Dr. Kristen Reeder, an attending physician at the Referral and Evaluation of At Risk Children Clinic (REACH) at Children's Medical Center in Dallas, testified about her evaluation of J. Dr. Reeder's education included a "three-year subspecialty fellowship training specifically in child abuse and neglect pediatrics," and without objection, the Department tendered her as an expert in her field. Dr. Reeder evaluated J. on October 6, 2021, after he had been admitted to the hospital for a blood infection and severe eczema and then referred to REACH due to concerns of possible neglect. Dr. Reeder stated J. had "Meticillin-sensitive Staphylococcus Aureus bacteria growing in his bloodstream that was most likely the result of the open wounds that he had on his body from his eczema," which he had from "head to toe." She said J. was physically very small and appeared sickly and inactive. Dr. Reeder stated that blood infections can be life threatening. She learned from Mother that Mother was J.'s primary caregiver; Father did not live with them at the time but visited occasionally. Dr. Reeder saw J. about two weeks later and found he was still exhibiting similar symptoms but said "his eczema was already showing some improvement."

Dr. Reeder reviewed Children's records and learned that J. was first diagnosed with eczema in the emergency room at Children's in October 2017 when he was four months old and he was eventually referred to the dermatology clinic at Children's in March 2018. The parents did not schedule J.'s first dermatology appointment until June 10, 2019, but he was not brought in for the appointment and was instead seen on June 14. Father and Mother were instructed to treat J. with Hydrocortisone, wrap him in "wet wraps," and Hydroxyzine, and they were to bring him back in for a follow-up visit in six to eight weeks. Dr. Reeder said J. was not brought in again until over a year later on August 19, 2020, and the parents either no-showed or cancelled several appointments in the interim. At the August 2020 appointment, the parents reported to the physician they had not been following J.'s prescribed treatment and so they were again instructed to follow the same course and follow up in six to eight weeks. They did not show up for J.'s next scheduled appointment on November 11, 2020.

Dr. Reeder stated J. was next brought into Children's for eczema-related problems when Mother brought him to the ER on December 8, 2020. Mother was again found to not be following the prescribed treatments and J. was again referred to dermatology. J. was brought to the emergency room for a "crushed finger" in February 2021 and was found to be "in distress from itching." He was not brought in for a follow-up appointment for the finger injury, and again missed a follow-up dermatology appointment in May 2021.

Dr. Reeder concluded Mother and Father failed to follow a minimum standard of medical care for J. and this failure created a medical emergency for him. She characterized their failure as "medical neglect," which she said "may have resulted in life threatening injuries or conditions." Dr. Reeder stated her conclusion of medical neglect was based upon J.'s clinical, physical state. She said it was "the worst case of eczema" she had ever seen and required "significant, daily, chronic care" that J. was not receiving; it was clear to her that the recommended treatments were not followed and appointments were not kept. She said untreated eczema caused J.'s blood infections and kept him from physically developing as a four-year-old should. Dr. Reeder also described J.'s eczema as painful and itchy. She said if J.'s blood infection continued to be untreated, it could have led to his death.

Mother testified her son C. was seven years old, her son J. was five years old, and her daughter H. was two years old. She stated Father was the biological father of the three children. Mother said the Department became involved with her family in September 2021. She said Kassandra Rodriguez from the Department tried to contact her regarding J.'s health and wanted to meet with her, but Mother said she did not meet with Rodriguez and regarded her communications as threats, so she "never really picked up the phone." Mother did not want J. to have to deal with the Department because "everybody had something to say about his eczema."

Mother said she was living with her mother in Dallas in 2021 when the Department was attempting to meet with her. Mother said she lived in Dallas with

her mother from June 2017 until March 2021, at which point she said she moved to Houston where she lived in an apartment provided by a friend she knew from high school. Father lived with her and the three children in Houston. She said her mother helped with J.'s medical care when they lived with her in Dallas. In Houston, Mother said J. was treated by the pediatric practice MD Kids but she did not know the name of any specific doctor who treated him. Mother said MD Kids was "a dermatology clinic and a pediatric clinic." She said she took him in "probably every four weeks" but that it varied—she said J. "never missed a doctor's or pediatric appointment." Mother testified she told Dr. Reeder about MD Kids, and she did not know why Dr. Reeder would lie to the court in testifying that Mother did not provide this information to her.

Mother said they moved back to Dallas following a car accident. Without their vehicle, they "had no choice but to come back to Dallas."

Mother stated she took J. to the emergency room in October 2021 after she noticed "little bumps" with "puss coming out," which she blamed on the changing seasons. Mother met with the Department at the hospital, and the children were taken into the care of the Department.

Mother had possession of C. and H. between November 2021 and August 2022, at which point they were removed on suspicion of abuse when C. went to school with a black eye. Mother was arrested for injury to a child, a first-degree felony—she was alleged to have punched C. in the eye—and that case was pending

at the time of trial. She denied ever punching C. and said she did not know how C. developed a black eye. Mother said C. had been at her mother's house the night before he went to school with the black eye, and when questioned whether if, in a previous hearing, she stated C. came from her own house, Mother invoked her Fifth Amendment rights. Mother was released on bond and one of her bond conditions prohibited her from having any contact with minor children.

Mother said that if her rights were not terminated and the Department's involvement with her children ended, she was not certain where she wanted her children to live. She was unaware of any relative or friend with whom the children could be placed if the children were removed from the Department's custody. Mother testified she was aware a home study had been completed on her mother and that it was denied.

Mother stated previously prescribed treatments did not help J.'s eczema, so she went to Children's but was provided the same medicine again. She said that before taking him to Children's in October 2021, she had been taking J. to different doctors and emergency rooms "every two or three weeks." Mother said she went to different doctors because she was seeking "a better solution for his skin." Mother said she did not believe J.'s condition was dangerous or life threatening, but she said it was painful. Mother said J.'s daycare was not administering his medicine as they should and that she removed him from that daycare as a result.

Appellant Father testified he was the biological father of J., C., and H. He said he went to doctor appointments for J.'s eczema shortly after his birth, and he took J. to the doctor when Mother was at work. He sometimes picked up J.'s prescribed medicines, which he could not name, other than that one of them was "Tramadol or something." Father said they missed appointments at Children's because "we transferred to MD kids," "because Children's wasn't really a big help." He believed Mother was giving J. his medicine, and he did not believe that J. was in danger, though he stated he thought the blood infection was dangerous and said he was concerned about the eczema. When questioned about what he did to make sure the children were safe after he learned there were concerns about J.'s treatment, Father said, "it was up to [Mother] and her mom to agree with it" and that he was "not the type of person to argue with nobody." Father testified he was caring for J. when J.'s condition worsened in October 2021.

Father testified he completed a court-ordered parenting class. He said since J. was in foster care, he had not been to any medical appointments or medical training sessions, though he had completed "about seven" training sessions at Children's, MD Kids, or Parkland before then. He said he had not been offered any additional training after J. entered foster care but he would be willing to attend additional sessions to better understand how to care for J.

Between October 2021 and September 2022, Father said he missed just two visits with J. But he admitted he told the Department caseworker that he was not

going to visit the children because Mother was not allowed to visit the children after her indictment resulting from the eye injury to C. He also said he could not visit because he was in Houston.

After C. and H. were placed in foster care, Father was court ordered to complete classes again. He said he did not complete his parenting class or anger management because he "was stabbed five times" and hospitalized. After November 2022, Father said he had not completed parenting classes, a psychological evaluation, anger management, or individual counseling. He said he had missed "probably four" random drug tests. He said he tested positive for marijuana because he "was around it," but that he had not used it since "this stuff that happened." Father also had not seen Mother use marijuana since having children.

Father testified he worked as a waiter at IHOP and full-time as a trash technician at a hospital. He said he had benefits and could make arrangements for the children's schooling and medical care. Father said he lived in Houston by himself in an apartment and was planning for the children to move in with him. Father stated he did not believe Mother hit C. in the eye because he believed she was not "that type of person"—he believed Mother should be around their children because she was "a good mom."

Department caseworker Tanisha McQueen testified she had been in her job for a year and a half. She had been assigned to the case involving C., J., and H. since September 2022. At that time, J. was in foster care and C. and H. were still living

with Mother. She said the nature of the referral that prompted the removal of C. and H. was suspected physical abuse against C. by Mother. Mother told McQueen that her grandmother took C. to school on the day of the incident, but Father told McQueen that C. was with him on the date of the incident.

McQueen testified Mother completed parenting classes and a psychological evaluation in March 2023. The evaluation yielded recommendations for Mother, including a virtual psychiatric evaluation and virtual individual counseling. Mother did not provide any documentation to McQueen that she completed the evaluation or counseling. Mother was also asked to complete drug testing in October 2022 and again in November, and she failed to submit to the testing. She was asked again in December but did not submit to testing until January, which yielded a result positive for marijuana. Mother again failed to complete drug testing in February and March of 2023.

McQueen testified Mother's mother was put forth as a placement for J., but the grandmother specifically declined to be considered a placement home for C. or H. The Department determined she would not be a suitable placement given that the children were living in her home when they were removed and she was unwilling to care for all three children. Further, McQueen testified the grandmother did not seem to appreciate the extent of J.'s medical needs or the danger of C. being assaulted. McQueen said the grandmother had not visited with the children since their removal.

–11–

McQueen testified Father had not completed the services ordered by the court in November 2022. She said he told her he did not complete his services because he was working. The services, McQueen said, were virtual and could be scheduled at his convenience. From September to December 2022, McQueen said Father visited the children, but inconsistently: he would "visit once" and then "skip two or three weeks, and then visit again." McQueen said after January 2023, Father did not visit the children. She said he was offered virtual visits, but he took advantage of just one such visit. Father did not provide McQueen with any relative or friend placement possibilities other than his sister, but he failed to provide her contact information and later stated she would not be able to take in the children.

McQueen also testified about the needs of the children. She said C. was seven years old and in first grade; he received behavioral therapy, speech therapy, and play therapy, and an ADHD/autism assessment was pending. J. was five and in kindergarten, and he received play therapy and behavioral therapy. He required frequent dermatology and primary care visits. McQueen said since she had been assigned the case, J. had not required any additional hospitalization and had not visited the emergency room other than December 2022 when he needed to get a medication refilled. She said he had not experienced any emergency circumstances related to his eczema, and his skin was now "very clear" and he scratched himself only when he was frustrated. McQueen said J.'s current treatment plan included using sensitive detergent and soap, body oil, three different creams daily, and the

drug Hydroxyzine for itching. McQueen said H. was two years old and had seasonal allergies and required ear tube surgery after repeated ear infections.

McQueen testified the children had all been together in one foster home since April 10, 2023. Their foster placement had indicated a desire to adopt the children if Mother's and Father's parental rights were terminated.

Despite requesting a copy of Father's lease, Father had not provided it to McQueen because, he said, it was none of the Department's business. McQueen said Father told her on March 20, 2023, that Mother would be moving in with him at his apartment in Houston. McQueen said Mother told her she was living with a friend in Houston but that she would be moving in with Father. McQueen said if the children were returned to Father, she was concerned Mother would be in the home. Further, she said she had no way of knowing if Father was drug free given that he had not taken drug tests he had been ordered to take. McQueen also questioned whether Father and Mother could administer J.'s treatment plan given that they had failed to do so previously, which they had never acknowledged. McQueen did not believe Father had a "working understanding" of J.'s medical needs.

Caseworker Amber Waters testified she had worked for the Department for two years, was previously assigned to C.'s case in October 2021, and worked on the case until September 2022. Apart from "attendance issues at school," Waters did not report any issues with C. and H. living with Mother. Waters spoke on the phone and texted with Father and saw him "from time to time when he would attend the

–13–

parent/child visits." She said Mother and Father did not consistently visit J. in November and December 2021; they told Waters they were unable to do so because of transportation issues or work. Waters attempted to give them bus passes but it was difficult "to track them down" to do so. She said Mother and Father either missed or arrived late three times in January 2022, three times in February 2022, and in March, Mother missed one visit and Father missed three. She said that in April, Mother and Father missed one visit. In the period stretching from May through August 2022, Waters said the parents' visitation was "spotty," at times going several weeks with no visit. She said there were times when J. was brought to the Department office and the parents did not show up, and on such occasions, J. would be confused and frustrated. Waters said she tried to work around the parents' schedules, but they continued to miss visits. Waters said Mother seemed to miss drug tests because she questioned why she needed to be drug tested at all. She said Father also failed to test consistently.

Kassandra Rodriguez testified she was a child investigator with the Department who had been assigned in September 2021 to investigate the reported medical neglect of J. Rodriguez went to Mother's address repeatedly over a two-week period to make contact with her, but she was unsuccessful in reaching Mother. Rodriguez eventually made contact with Mother over the phone and Mother told her the other children were "out of town" but would not specify where. She eventually made contact in person with Mother and J. at Children's in Dallas

Deborah Mays testified she was appointed as a special advocate in this case in 2021. Mays said she would be concerned if J. were returned to Mother because she previously neglected to adequately address his medical needs and J. continued to need "a lot of attention." Mays said J. was doing well at the time of trial "in terms of his eczema" but that he still needed to be taken to his appointments and still required treatments. She said Mother's inability to make it to visits when the children were in foster care gave her further reason to doubt Mother would "be able to do the things medically that are needed as well." Mays stated she had the same concerns about Father because he had failed a drug test and she believed he put Mother's needs ahead of the children's. She said all three children continued to have a lot of needs. Mays said the Department had done its due diligence when it came to finding a relative or fictive kin placement.

Mays testified C. stated Mother caused his black eye by striking him. By the time Mays visited C. after this incident, his eye "had healed some, [but] not completely." She was concerned that Father and Mother's mother did not seem to believe or support C.

The attorney ad litem for the children reported to the trial court that she was surprised the case got to point of the Department seeking termination because, "given the amount of support that the parents had, [she] thought we would be able to reunify the children with family." But she believed it was time for the children to have stability, and the only way she could see for that to happen would be to

"terminate the rights of the parents so that these children can be able to be adopted and finally achieve some stability."

The Department admitted a family plan evaluation from November 2022 that reflected that C. had a bond with his parents and loved them and had a very close relationship with his siblings. C. also enjoyed living with his foster parents and was "working on building a bond with" them. J. also reportedly "displayed a bond with his parents when they visit him" and loved them, had a "very close relationship" with his siblings, and built "a close relationship with his foster mother," confided in her, and "expressed a sense of safety and security within his foster family." H. reportedly had a bond with her parents and was "doing well in her placement" and was "working on building a bond with her foster parents," who supported her growth and development.

After hearing the above evidence, the trial court reserved its ruling and ordered the parents to submit to drug testing by the next day. The court informed the parties and attorneys that once she got the results back, she would notify them and also send out her ruling in the case. Father's nail drug test results filed with the trial court were positive for cocaine and marijuana. Mother's urine drug test result filed with the court was positive for marijuana.

Following a memorandum ruling, the trial court entered an order of termination on April 6, 2023. The court found by clear and convincing evidence that Mother knowingly placed or knowingly allowed the children to remain in

conditions or surroundings which endanger the physical or emotional well-being of the children, engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, and that termination of the parent-child relationship between Mother and C., J., and H. was in the children's best interest. Further, the court found by clear and convicting evidence that Father knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children of the children, and that termination of the parent-child relationship between C., J., and H. and Father was in the children's best interest. The Department was appointed permanent managing conservator of the children with the right to consent to the children's adoptions.

## II. Discussion

In four issues, Father contends the evidence is legally and factually insufficient to support the court's findings under §§ 161.001(b)(1)(D) and 161.001(b)(1)(E), that the termination of Father's parental rights is in the best interest of the children, and to support the appointment of the Department as managing conservator of the children.

*A.  Standard of review*

"Because the fundamental liberty interest of a parent in the care, custody, and control of his child is one of constitutional dimensions, involuntary parental termination must be strictly scrutinized." *In re C.V. L.*, 591 S.W.3d 734, 748 (Tex. App.—Dallas 2019, pet. denied) (citing *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000)).  While we acknowledge the constitutional dimensions of parental rights, we also recognize the imperative that the "emotional and physical interests of the child not be sacrificed merely to preserve" those rights.  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).  The evidence supporting termination must be clear and convincing before a court may involuntarily terminate a parent's rights.  *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  Clear and convincing evidence is the measure or degree of proof that will produce in the mind of the fact finder a "firm belief or conviction" as to the truth of the allegations.  TEX. FAM. CODE § 101.007.

Termination of parental rights requires proof by clear and convincing evidence that (1) a parent committed one or more of the enumerated statutory acts in § 161.001(b)(1) of the family code, and (2) termination is in the best interest of the child.  *See* TEX. FAM. CODE § 161.001(b).  Because the standard of proof is "clear and convincing evidence," the supreme court has held that the usual legal and factual standards of review are inadequate.  *In re M.A.J.*, 612 S.W.3d 398, 405–06 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (op. on reh'g) (citing *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002)).

Instead, in conducting legal sufficiency review in a parental termination case, we determine whether the evidence, viewed in the light most favorable to the finding, is such that a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. "[L]ooking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* We consider all the evidence—not just the evidence favoring the verdict—and we assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so. *In re J.D.B.*, 435 S.W.3d 452, 462–63 (Tex. App.—Dallas 2014, no pet.). We also disregard all evidence a reasonable factfinder could have disbelieved or found incredible. *In re J.F.C.*, 96 S.W.3d at 266.

In factual sufficiency review in a parental termination case, we consider the entire record, including evidence both supporting and contradicting the finding, and determine whether a reasonable factfinder could have formed a firm conviction or belief about the truth of the allegation. *In re C.H.*, 89 S.W.3d at 25–26. We "consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *In re J.F.C.*, 96 S.W.3d at 266. We give due deference to the decisions of the factfinder because the factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses and do not supplant the trial court's judgment with our own. *In re J.D.B.*,

–19–

435 S.W.3d at 463. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

*B. Subsections (D) and (E)*

In his first two issues, Father challenges the trial court's findings under family code §§ 161.001(b)(1)(D) and 161.001(b)(1)(E). Because evidence relating to these subsections is interrelated, we will consider these two issues together.

Parental rights may be terminated under § 161.001(b)(1)(D) if clear and convincing evidence supports a finding that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Under § 161.001(b)(1)(E), parental rights may be terminated if clear and convincing evidence supports a finding that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

Both subsections (D) and (E) require proof of endangerment. *In re J.D.B.*, 435 S.W.3d 452, 463 (Tex. App.—Dallas 2014, no pet.). "'Endanger' means to expose to loss or injury, or to jeopardize a child's emotional or physical health, but it is not necessary that the conduct be directed at the child or that the child actually suffer an injury." *Id.*; *see also Tex. Dep't of Human Services v. Boyd*, 727 S.W.2d

531, 533 (Tex. 1987); *In re C.V. L.*, 591 S.W.3d 734, 750 (Tex. App.—Dallas 2019, pet. denied). Furthermore:

> Specific danger to the child's well-being may be inferred from the parent's misconduct alone. A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. The specific danger to the child's well-being may be inferred from parental misconduct standing alone.

*In re C.V. L.*, 591 S.W.3d at 750 (internal citations omitted).

The primary distinction between the two subsections is the source of the physical or emotional endangerment to the child: "subsection (D) addresses the child's surroundings and environment while subsection (E) addresses parental misconduct." *Id.* While subsection (D) refers to "the acceptability of a child's living conditions[,]" subsection (E) refers "to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act." *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied). However, parental conduct is of course relevant to a determination under subsection (D) regarding the child's environment. *In re J.D.B.*, 435 S.W.3d at 463.

A voluntary, deliberate, and conscious course of conduct by the parent is required for termination under (E)—it "must be based on more than a single act or omission." *In re C.V. L.*, 591 S.W.3d at 750.

### C. Analysis

Father argues the evidence is insufficient to support the finding under subsection (D) because evidence showed Mother sought appropriate treatment for

–21–

J.'s medical problems and that the children were with Mother, whom he believed was appropriately caring for the children. He also argues insufficient evidence showed Mother injured C. Father generally argues the subsection (E) finding is unsupported by the evidence because the evidence showed Father supported J.'s well-being and did nothing to harm any of the children.

As discussed above, the Department presented evidence that the children lived in an environment in which Mother and Father failed to adequately address and treat J.'s severe eczema to the point he had a blood infection that could have been life threatening and required hospitalization. Mother and Father knew J.'s diagnosis shortly after his birth in 2017 and thereafter repeatedly failed to follow and consistently administer prescribed treatments and to show up for scheduled appointments with J.'s doctors. Evidence showing Father was aware of the seriousness of J.'s condition includes testimony that Father lived with Mother and the children in Houston for much of 2021, up until shortly before J.'s hospitalization in October 2021, Father's testimony he was caring for J. before he was hospitalized, and Father's testimony that he was aware the eczema was bad and that he was concerned about it. Despite this, Father testified he left things up to Mother and her mother.

Evidence also showed C. had a black eye and that C. told others Mother caused the black eye by striking him. Mother, her mother, and Father gave conflicting stories about who had possession of C. around the time of the incident

and could not explain the injury. *See In re I.S.*, No. 05-19-00709-CV, 2019 WL 6696037, at *8 (Tex. App.—Dallas Dec. 9, 2019, no pet.) (mem. op.) (discussing child's unexplained injury as evidence supporting termination under (D) and (E)). Mother was facing criminal charges and invoked her Fifth Amendment rights when questioned about the alleged assault. Father did not believe C. because he believed Mother to be a good mom.

Father points to his testimony that although J. missed his appointments with Children's, he was taken to appointments at MD Kids and that they were appropriately caring for J. Other evidence contradicted his testimony. Dr. Reeder testified that the parents reported in 2020 that they were not following J.'s prescribed treatments, and moreover, J.'s poor condition in 2021 was evidence in itself that the parents were not taking proper care of J. The trial court was the sole arbiter of the credibility of the witnesses and the weight to give their testimony. *See, e.g.*, *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (appellate court must give "due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses").

Though most of the parents' acts and omissions put forth by the Department relate directly to J., this does not make the evidence insufficient as to Father's parent-child relationship with C. or H. because, as stated above, "it is not necessary that the conduct be directed at the child or that the child actually suffer an injury." *In re*

–23–

*J.D.B.*, 435 S.W.3d at 463; *Boyd*, 727 S.W.2d at 533 (endangering acts need not be committed in child's presence, be directed at child, or cause physical injury to child). Violent acts directed toward one child can endanger other children who are not the direct victims of the acts in question and support termination of parental rights as to the other children. *See Dir. of Dallas Cnty. Child Protective Servs. Unit of Tex. Dep't of Human Servs. v. Bowling*, 833 S.W.2d 730, 733 (Tex. App.—Dallas 1992, no writ); *In re T.L.E.*, 579 S.W.3d 616, 625 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). The courts of appeals have so held, "even if the other children were not yet born at the time of the conduct." *See In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *16 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.). This is true in cases of medical neglect, too. *See In re A.A.H.*, No. 01-19-00612-CV, 2020 WL 1056941, at *12 (Tex. App.—Houston [1st Dist.] Mar. 5, 2020, pet. denied) (mem. op.) (evidence of medical neglect of one child was sufficient to show endangering environment and conduct as to another child because "it is not necessary that the conduct be directed at the child that is the subject of the suit or that that the child actually suffer injury").

Given all of this, we conclude a reasonable factfinder could have formed a firm belief or conviction that Father knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, and engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of

–24–

the children. We also conclude the disputed evidence a reasonable factfinder could not have credited in favor of the two findings under subsections (D) and (E) is not so significant that a factfinder could not have reasonably formed a firm belief or conviction as to their truth. Accordingly, we conclude the evidence is legally and factually sufficient to support the trial court's predicate act findings under § 161.001(b)(1).

*D. Best interest*

Father also challenges the trial court's finding that terminating Father's parent-child relationship with the children was in the children's best interest. Under § 161.001(b)(2), the trial court must find by clear and convincing evidence that the termination of the parent-child relationship is in the best interest of the child. TEX. FAM. CODE § 161.001(b)(2). Though a strong presumption exists that remaining with a parent is in the child's best interest, *see* TEX. FAM. CODE § 153.131(b), *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam), the prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest, *see* TEX. FAM. CODE § 263.307(a), *In re K.S.L.*, 538 S.W.3d 107, 115 (Tex. 2017).

We look to certain non-exclusive factors enumerated by the supreme court in *Holley v. Adams* in determining the child's best interest. 544 S.W.2d 367, 371–72 (Tex. 1976). These include (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical

danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* at 372.

Evidence is not required on all of these factors to support a best interest finding, *In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied), or to put it differently, the absence of evidence on some of these factors does not preclude a best interest finding, "particularly if undisputed evidence shows the parental relationship endangered the child's safety," *In re N.T.*, 474 S.W.3d 465, 477 (Tex. App.—Dallas 2015, no pet.). Indeed, "evidence relating to one single factor may be adequate in a particular situation to support a finding that termination is in the best interests of the child." *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.).

A trial court may infer that past endangering conduct may recur if the child is returned to the parent in making its best interest determination. *See In re L.N.C.*, 573 S.W.3d 309, 318 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). Evidence relevant to § 161.001(b)(1) termination grounds may also be relevant to the question of the child's best interest. *In re C.V.L.*, 591 S.W.3d 734, 753 (Tex.

–26–

App.—Dallas 2019, pet. denied). However, the question of a child's best interest is not equivalent to a finding of endangerment: "'best interest' is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013).

*E. Analysis*

The children did not testify at trial, and no one testified about their desires. However, the family plan evaluation admitted into evidence reflected that J. and C. loved their parents, all three children were bonded to their parents, and that all three children were building bonds with their foster family, which was reportedly providing safety and stability for them.

Evidence showed J. had significant physical needs relating to continued treatment for his eczema and that he was also going to behavioral and play therapy. J. used multiple creams for his skin and took medicine to prevent itching. C. also had significant needs, requiring various therapies and had a pending evaluation for autism and ADHD.

Evidence relating to the emotional and physical dangers to the children largely overlaps with the evidence discussed above under subsections (D) and (E), and it is also pertinent to Father's parental abilities and whether any acts or omissions indicate the existing parent-child relationship is not a proper one. When the children were previously subject to Father's care, J.'s eczema was not treated properly and evidence showed C. reported that Mother assaulted him. J. and C. both required

frequent transportation to therapy and other appointments, and evidence showed Father did not always provide it.

Additional evidence was presented on the parenting abilities and plans for the children of those seeking custody of the children, as well as the stability of the proposed placements. After the children were removed, Father inconsistently visited them and visited them only twice in 2023. He did not complete court-ordered services including parenting classes, psychological evaluation, anger management, drugs tests, or individual counseling. Father's plan was for the children to live with him in his apartment in Houston, but evidence also showed he planned to live with Mother despite concerns of physical abuse. The Department's plan was for the children's foster family to adopt them, and evidence showed this was the foster family's intent if Mother's and Father's parental rights were terminated.

Considering the above evidence in light of the *Holley* factors, we conclude a reasonable factfinder could have formed a firm belief or conviction that termination of the parent-child relationship between Father and the children was in the children's best interest, and that any evidence contradicting that finding was not so significant so as to preclude a factfinder from reasonably forming a firm belief or conviction of the finding. Although some evidence showed the children were bonded to their parents, the factors of emotional and physical needs and dangers, parenting abilities, the stability of the home, and acts or omissions of the parents indicating the parent-child relationship is improper all weigh in favor of the trial court's best interest

finding.  Consequently, we conclude legally and factually sufficient evidence supports the trial court's finding, and we overrule Father's third issue.[3]

*F. Managing conservator*

In his final issue, Father contends the evidence is insufficient to support the appointment of the Department as managing conservator.  We reject this argument because we concluded above that sufficient evidence supports the trial court's termination order.  As we have explained previously,

> In the case before us, "we have overruled appellant's challenge to the termination, and the trial court's appointment of the Department as sole managing conservator may be considered a 'consequence of the termination pursuant to Family Code section 161.207.'" Further, Mother "provides no authority for the proposition that she is a 'suitable, competent adult' as contemplated by section 161.207(a) or that the presumption in section 153.131(a) applies to a parent whose parental rights have been terminated under Chapter 161." Accordingly, Mother's challenge to the trial court's appointment of the Department as sole managing conservator, rather than Mother, "is without merit."

*In re N.T.*, 474 S.W.3d at 481 (internal citations omitted); *In re S.O.*, No. 05-22-01019-CV, 2023 WL 2237084, at *17 (Tex. App.—Dallas Feb. 27, 2023, no pet.) (mem. op.).

Moreover, Father lacks standing to challenge the trial court's appointment of the Department as managing conservator of the children.  If the court terminates the

---

[3] Father argues the drug tests ordered by the trial court at the end of the bench trial were not evidence properly before the court and cannot support the order of termination.  Although we find this argument inadequately briefed, *see* TEX. R. APP. P. 38.1(i), because we find the evidence to be sufficient without considering the final drug tests, the resolution of this issue is unnecessary to the final disposition of the appeal and we do not reach it.  TEX. R. APP. P. 47.1.

parent-child relationship with respect to both parents, "the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a). An order terminating the parent-child relationship divests the parent of all legal rights and duties with respect to the child. *Id.* § 161.206(b). Because we have overruled Father's challenge to the termination of his parental rights to the children, he has been divested of his rights and duties related to the children. Therefore, we conclude Father does not have standing to challenge the portion of the order appointing the Department as conservator of the children. *See In re R.B.*, No. 05-21-00043-CV, 2021 WL 2943927, at *15 (Tex. App.—Dallas July 9, 2021, no pet.) (mem. op.); *In re E.M.*, No. 05-18-01161-CV, 2019 WL 1449791, at *9 (Tex. App.—Dallas Apr. 1, 2019, no pet.) (mem. op.); *In re J.D.G.*, 570 S.W.3d 839, 856 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). We overrule Father's final issue.

### G. Department's cross-issue

The Department urges us in a cross-issue to correct a typographical error in the trial court's order of termination. The order identifies H. as having a middle name beginning with "D" rather than one beginning with "N." The Department points out that the record is clear that H.'s middle name begins with "N." We agree. When we have the necessary information to do so, we may correct clerical errors in the judgment. *See* TEX. R. APP. P. 43.2(b); *In re A.B.*, 458 S.W.3d 207, 210 (Tex.

–30–

App.—Dallas 2015, pet. denied). Accordingly, we delete H.'s middle name "D*****" in the order of termination and replace it with the correct middle name beginning with "N" as identified in the Department's October 7, 2021, original petition.

## III.   Conclusion

As modified, we affirm the trial court's order terminating Father's parental rights to the children.

230582f.p05

/Ken Molberg/
KEN MOLBERG
JUSTICE



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF C.D.M.,
J.L.M., AND H.N.P., CHILDREN

No. 05-23-00582-CV

On Appeal from the 255th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DF-21-16421.
Opinion delivered by Justice
Molberg. Justices Carlyle and Smith
participating.

In accordance with this Court's opinion of this date, the May 22, 2023 order of termination is **MODIFIED** as follows:

H.N.P.'s listed middle name of "D*****" is replaced with H.N.P's correct middle name, "N*****", as reflected in the Department's October 7, 2021 Original Petition for Protection of a Child.

It is **ORDERED** that, as modified, the trial court's order of termination is **AFFIRMED**.

Judgment entered this 31st day of October, 2023.